IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**FILED**

**MAY 2 0 2004**

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| LOIS JOHNSON & JIMMIE BARKER | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CASE NO. 2:04-CV-475-F |
| V. | ) |
| | ) |
| MONTGOMERY COUNTY BOARD | ) |
| OF EDUCATION, et al., | ) |
| Defendants. | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## REQUEST FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTIVE RELIEF

### INTRODUCTION

This is an employment discrimination action against the Montgomery County Board of Education. Plaintiffs Lois Johnson ("Ms. Johnson") and Jimmie Barker ("Mr. Barker") bring suit against their employer, the Montgomery County Board of Education ("Board") pursuant to 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII") and 42 U.S.C. § 1981 and 1981(a). The Board announced its intention on or about May 17, 2004 to replace current Superintendent Clinton Carter with another current employee (white male). Plaintiffs contend that the promotion of a white male (Michael Looney) to the position of Superintendent constitutes violation of rights afforded to plaintiffs, both of whom are African American, and against Ms. Johnson, based upon gender. Plaintiffs contend that race and gender are motivating factors in, or are contributing to, the Board's refusal to (1) advertise the position of superintendent and (2) delay or suspend the replacement of Clinton Carter, whose contract of employment does not expire until May of 2005. Defendants deny these claims and contend that they are entitled to entry of order in their favor on all claims. Plaintiffs file herewith their argument in support of request for injunctive relief pursuant to the provisions of Rule 65, Federal Rules of Civil Procedure.

## Legal Argument

### The Standard of Review

To obtain the relief requested in presenting motion for preliminary injunctive relief, plaintiffs must show to the satisfaction of the Court that: (a) plaintiffs are likely to prevail on the merits of their case ("substantial likelihood of success"); (b) plaintiffs will suffer irreparable harm (injury) if the injunctive relief is not granted; (c) there would be no substantial hardship to defendants if the relief were granted ("the threatened injury to the movant outweighs the threatened harm the proposed injunction may cause the opposing party"); and, (d) the public interest would be served by the award of the injunctive relief. T Backs Club, Inc. v. Seaton, 84 F. Supp. 2d 1317, 1319 (U. S. Dist. Ct., M. D. Ala. 2000), citing McDonald's Corp v. Robertson , 147 F. 3d 1301, 1306 (11th Cir. 1998 (citing All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc., 887 F. 2d 1535, 1537 (11th Cir. 1989), see also: Haitian refugee Center, Inc. v. Nelson, 872 F.2d 1555, 1561-1562, (11th Cir. Fla. 1989), aff'd on other grounds, sub. nom., McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991); Johnson v. United States Department of Agriculture, 734 F.2d 774 (11th Cir. 1984); Save Our Dunes v. Pegues, 849 F.2d 1480, (11th Cir. 1988) on remand, Save Our Dunes v. Pegues, 691 F.Supp. 1338 (U.S. Dist. Ct., M.D. Ala. 1988); Lucero v. Operation Rescue of Birmingham, 954 F.2d 624, (11th Cir. 1992), reh. denied, 961 F.2d 224 (11th Cir. 1993). Plaintiffs have properly brought their claims to this court for consideration and submit that injunctive relief is proper where the flawed hiring and selection process cannot be remedied by post-selection review. Stallworth v. City of Evergreen, 680 So. 2d 229, 234 (Ala. 1996) [state employee with legitimate claim of entitlement to continued employment may demand procedural due process protection]. See also: Goss v. Lopez, 419 U. S. 565, 573 (1975), quoted in Stallworth at p.233. As the injury to plaintiffs will be immediate and irreparable, they are entitled to the relief requested, including entry of order in their favor.

2

## I.  There is a substantial likelihood that plaintiffs will prevail (success) on the merits.

In requesting the relief contained in the petition and complaint filed in this action, plaintiffs are not required to show, at hearing on request for injunctive relief, that they will ultimately prevail on the merits of their case.  Instead, plaintiffs are required only to show that there is a *substantial likelihood* that they will prevail on the merits of their case.  T Backs Club, Inc. v. Seaton, 84 F. Supp. 2d 1317, 1319 (U. S. Dist. Ct., M. D. Ala. 2000);   York v. Alabama State Board of Education,  581 F.Supp. 779 (U.S. District Court, M.D. Ala., 1983); Cable Holdings of Battlefield, Inc. v. Cooke, 764 F.2d 1466, 1474 (11th Cir. Ga. 1985); Gartrell v. Knight, 546 F.Supp. 449 (U.S. Dist. Ct., Ala. 1983); Board of Dental Examiners of Alabama v. Franks, 507 So.2d 517 (Ala. Civ. App. 1986), cert. quashed, Ex parte,  Board of Dental Examiners of Alabama, 507 So.2d 521 (Ala. 1986); Martin v. First Federal Savings and Loan Association of Andalusia, 559 So.2d 1075 (Ala. 1990).  In a manner similar to those involving flawed pre-termination hearings, plaintiffs have properly brought to the attention of this court their request for injunctive and declaratory relief.   Stallworth v. City of Evergreen, 680 So. 2d 229, 233 (Ala. 1996) ["'a state employee who under color of state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for dismissal may demand the procedural protections of due process'" *quoting* Goss v. Lopez, 419 U. S. 565, 573 (1975)].  Injunctive relief is proper where the flawed pre-termination process cannot be remedied by post-termination review. Stallworth, Id. At p. 234.

For the reasons set out above and herein, Plaintiffs respectfully submit that defendants are without legal authority or jurisdiction to proceed with hiring of replacement for Superintendent Carter and the promotion of

white male (Michael Looney).  Clearly, defendants have failed or refused to comply with the provisions of the

Alabama posting statute and the relevant provisions of Title VII.  Because plaintiffs have presented sufficient

showing of substantial likelihood that they will prevail on the merits of their case, plaintiffs are entitled to the

relief requested.  Gartrell v. Knight, 546 F.Supp. 449 (U.S. Dist. Ct. 1983).


## II.  Plaintiffs will suffer irreparable harm if the relief requested is not granted.

In considering the merits of plaintiffs' request for injunctive relief, the Court must determine whether the

injunctive relief is necessary to prevent irreparable harm (injury) to plaintiffs, whether such injury is imminent,

and whether such injury would be irreparable in a court of law.  T Backs Club, Inc. v. Seaton, 84 F. Supp. 2d

1317, 1319 (U. S. Dist. Ct., M. D. Ala. 2000); Newman v. State of Alabama, 683 F.2d 1312 (11th Cir. 1982); cert.

denied 460 U.S. 1083 (1984).  Petroleum Equipment Tool Co. v. State Board of Health, 567 So.12d 328 (Ala.

Civ. App. 1990); Howell Pipeline, Inc. v. Geterra Resources, Inc., 454 So.2d 1353 (Ala. 1984).  Plaintiffs are

entitled to preliminary injunctive relief upon a showing that such relief is necessary to insure that a remedy will

be available at the end of the proceedings.  United States v. State of Alabama, 791 F.2d 1450 (11th Cir. 1986);

reh. denied, 796 F.2d 1479; cert. den., Board of Trustees of Alabama State University v. Ala. State Bd. of Ed.,

479 U.S. 1085 (1988), cited in Benetton S.P.A. v. Benedot, Inc., 642 So. 2d 394, 401 (Ala. 1994).

As set out in the petition, complaint, and affidavits, plaintiffs will suffer irreparable harm if the injunctive

relief is not granted.  Further, such irreparable harm to plaintiffs could not be undone or satisfied at a later date

by virtue of any legal remedies or relief.  At the present time, plaintiffs are unable to make application for or be

considered for the position of promotion to Superintendent, a goal contemplated by their professional careers.

Plaintiffs submit that defendants' deprivation of their statutory and constitutional rights support their request for

the issuance of injunctive relief in that protection of constitutional rights is a factor which is superior to any

4

alleged adverse effect which defendants contend the issuance of such relief would cause.  Central Alabama

Paving, inc. v. James, 499 F.Supp. 629 (U.S. Dist. Ct. Ala. 1980).  Plaintiffs also assert that the threat of

impairment to their constitutional rights constitute sufficient claim of irreparable injury to support the relief

requested.  Jaffree by and through Jaffree v. James, 544 F.Supp. 727 (U.S. Dist. Ct., D. Ct. Ala. 1982).

Plaintiffs also submit that the relief requested should be granted immediately; otherwise, the remedy

that they request may not be available at a later date.  Plaintiffs are entitled to the relief requested due to the

possibility that corrective relief, such as mere post-employment review of defendants' hiring process and

decision, would not be available at a later date and mere compensatory relief at a later date would be

inadequate.  United States v. State of Alabama, 791 F.2d 1450 (11th Cir. 1986) reh. denied, 796 F.2d 1479 (11th

Cir. 1987); cert. denied, Board of Trustees of Alabama State University v. Alabama State Board of Education,

479 U.S. 1085 (1988).

Plaintiffs are entitled to the relief requested in that they risk immediate and irreparable harm due to the

loss of promotion opportunity (with attendant increase in or access to certain economic and non-economic

factors including but not limited to, status, opportunity, professional achievement, benefits and compensation) if

the relief requested is not granted.  Additionally, plaintiffs risk immediate and irreparable harm from the adverse

professional impact that such contemplated action will have.  Plaintiffs assert that the actions of the defendants

will result in adverse consequences in that their ultimate career plans and goals will be thwarted, their personal

and professional opportunities will be lost, and the possibility that such opportunity might present itself in the

future is exceedingly remote.  Such allegations of violation of rights provide convincing authority for the propriety

of the issuance of the relief requested.

Plaintiffs respectfully submit that injunctive relief in this case is warranted due to the fact that the

ultimate legal remedies of review of hiring record and attempts to nullify Board action would be inadequate to

restore plaintiffs to their pre-selection, pre-hiring employment positions.  Certainly, there would be no pecuniary damage amount that could be awarded to the plaintiffs at the end of a successful trial on the merits of this case that would be adequate to fully compensate and make the plaintiffs whole.  For these reasons, the granting of plaintiffs' request for injunctive relief would be proper.

## III.  Defendants will suffer no irreparable harm as opposing parties if the requested injunctive relief is granted.

Defendants will suffer no irreparable harm if the injunctive relief as requested by plaintiffs is granted.  To the contrary, there would appear to be substantial savings of defendants' manpower and other resources if the injunctive relief were to be granted.  Counsel for plaintiff respectfully submits that maintenance of the status quo, pending further proceedings would be less harmful to defendants, and the public, than the denial of the injunctive relief would be to the plaintiff. T Backs Club, Inc. v. Seaton, 84 F. Supp. 2d 1317, 1319 (U. S. Dist. Ct., M. D. Ala. 2000). For these reasons, plaintiffs respectfully submit that they are entitled to the relief requested. Alabama Home Health Care, Inc. v. Schweiker, 527 F.Supp. 849 (U.S. Dis. Ct., N.D. Ala 1981), appeal dismissed and order vacated, Alabama Home Health Care, Inc. v. Heckler, 711 F.2d 988 (11th Cir. Ala. 1983).  Plaintiffs submit that there would be greater harm to them, as 20+ year veterans of the school system, from the denial of the preliminary relief than that harm, if any, which defendants would suffer from the granting of the request. Central Alabama Paving, Inc. v. James, 499 F.Supp. 629 (U.S. Dist. Ct. Ala. 1980)

In determining whether injunctive relief in this case would be proper, the Court may consider the relative hardships that each party may suffer against the benefits which would flow from the grant of the injunctive relief requested.  Plaintiffs respectfully submit that the guarantee of their constitutional rights and rights of access

under state and federal laws are issues that are superior to any alleged adverse effect which defendants may contend such granting of the relief would have.   Central Alabama Paving, Inc. v. James, 499 F. Supp. 629 (U. S. Dist. Ct., Ala., 1980).   Because, in this case, the granting of the injunction would result in relatively little harm, if any, to defendants, plaintiffs respectfully submit that they are entitled to the issuance of the order.   Gartrell v. Knight, 546 F. Supp. 449 (U. S. Dist. Ct., Ala., 1983).

In the instant case, the harm and injury to the plaintiffs are immediate and obvious.   It is not apparent, however, that any benefits would not continue to flow to defendants if the employment process is stayed and plaintiffs are allowed  to participate in any employment search or process, pending further orders of the Court. There simply is no apparent harm or injury that would result to defendants if the order were to be granted.   The apparent process contemplated by defendants is to have the termination of Superintendent Carter go forward, and thereafter the selection and hiring process proceed, with plaintiffs, presumably, preserving their objections, and thereafter plaintiffs may take some type of action requesting review of the hiring, assuming adverse employment decision is made.   As defendants (at least one of them) apparently concede that a search process should be undertaken, there would be no harm to defendants to delay any further efforts to terminate (or buy out) Superintendent Carter's contract, unless they are so committed to placement of the pre-selected and pre-determined white male in the position of Superintendent that plaintiffs' request for stay pending ruling cannot be considered.   As defendants are required to follow all state and federal laws in the performance of its duties relative to the running of the Montgomery Public Schools, the injunctive relief requested by the plaintiffs should be granted.

## IV.  The Public Interest would be best served by the
## Granting of the request for Temporary Restraining Order and other relief.

The public interest would be best served by the issuance of the injunctive relief as requested by plaintiffs.  Plaintiffs must be protected from the arbitrary and capricious actions of the defendants.  Federal and state laws, as well as the policies and procedures of educational systems themselves, must be construed in a coherent, fair, and constitutional manner.  In this case, the granting of the order would accomplish this goal.  Furthermore, the public interest would be best served by the granting of the relief requested by plaintiffs as the delay in terminating and replacing Superintendent Carter would provide an objective process by which the court (as well as the public) could insure that such statutory and constitutional defects do not occur.  As defendants' actions indicate that they are not required to follow the posting laws, board policies, or federal laws, such actions must be examined by the Court. Thereafter, if not invalidated by this Court, such precedent would create an untrustworthy and incorrect result.  Certainly, the public interest will be best served where plaintiffs' exercise and enjoyment of their constitutionally protected rights are protected. Central Alabama Paving, Inc., v. James, supra. Certainly, the interests of the public are best served where the limited resources of the local board, the court, and of the judicial process are conserved by staying board hiring, pending further action in this case. Scott v. Alabama State Board of Education, 300 F. Supp. 163, 168 (U. S. Dist. Ct. M. D. Alabama 1969) (maintain status quo while court retains complete jurisdiction; court should be free from pressures, direct or indirect).

8

## *CONCLUSION*

For the foregoing reasons, plaintiffs request that the court enter an order that would require the Board of Education of the Montgomery County Schools to stay all termination and hiring proceedings pending hearing, ruling or other action from this court's consideration of their claims, based upon defendants' failure or refusal to follow the provisions of the Alabama Law, in particular the provisions of the Posting Law, as codified in §16-22-15, Code of Alabama (1975) ("vacant personnel position" must be posted) and those provisions of Title VII as more fully set out in complaint and petition previously filed.  Plaintiffs also request that this matter be set for further hearings or orders at a time determined by the court to be proper.   Counsel will be pleased to provide drafts of proposed orders for the consideration of the court.

Respectfully Submitted on this 21th day of May, 2004 by the following counsel for the plaintiff:

Theron Stokes
P.O. Box 4177
Montgomery, AL  36103-4177
Telephone:      (334) 834-9790
Facsimile:      (334) 834-7034

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was submitted by one or more of the following methods: via hand delivery in open court, facsimile transfer or U. S. Mail, postage prepaid, to the following counsel for defendants at the address noted, on this the 20th day of May, 2004.

The Honorable James R. Seale
Attorney at Law
Hill, Hill, Carter, Franco, Cole & Black, P. C.
P. O. Box 116
Montgomery, AL  36101-10016

Counsel for the Plaintiffs

9

680 So.2d 229
11 IER Cases 1197
(Cite as: 680 So.2d 229)

Page 1

Supreme Court of Alabama.

**Freddie L. STALLWORTH**
v.
**CITY OF EVERGREEN, Alabama, et al.**

**1941622.**

May 3, 1996.
Rehearing Denied June 21, 1996.

The Conecuh Circuit Court, No. CV-94-047, Charles C. Partin, J., affirmed city council's approval of termination of city personnel officer, and he appealed. The Supreme Court, Houston, J., held that due process rights of officer, who had property right in his employment, were violated by pretermination hearing in which mayor and city administrator served as hearing officers in case in which they also testified as material witnesses and the holding of posttermination hearing before Review Board did not remedy earlier deprivation of officer's right to constitutionally adequate pretermination hearing.

Reversed and remanded.

West Headnotes

**[1] Constitutional Law ⚖➝278(1)**
92k278(1)

Fourteenth Amendment forbids state or any subdivision thereof from taking person's property without providing that person with due process of law. U.S.C.A. Const.Amend. 14.

**[2] Constitutional Law ⚖➝278.4(5)**
92k278.4(5)

State employee who under state law, or rules promulgated by state officials, has legitimate claim of entitlement to continued employment absent sufficient cause for dismissal, may demand procedural protections of due process. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law ⚖➝251.5**
92k251.5

Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. U.S.C.A. Const.Amend. 14.

**[4] Constitutional Law ⚖➝251.5**
92k251.5

Unbiased and impartial decisionmaker is one of the most, if not the most, fundamental of requirements of fairness and due process. U.S.C.A. Const.Amend. 14.

**[5] Constitutional Law ⚖➝278.4(5)**
92k278.4(5)

Although hearing officer at pretermination hearing need only determine whether there are reasonable grounds to believe that charges against municipal employee are true and support the proposed action, the most basic precepts of due process of law require that the person making that decision, the hearing officer, be relatively unbiased and impartial; it also offends the most basic traditional notions of due process to have a person serve as hearing officer in case in which he testifies as a material witness. U.S.C.A. Const.Amend. 14.

**[6] Courts ⚖➝97(1)**
106k97(1)

State courts must apply federal constitutional law as enunciated by United States Supreme Court and caselaw from the various federal circuit courts of appeals, although of invaluable aid in understanding federal law as enunciated by the Supreme Court, is only persuasive authority in state courts.

**[7] Administrative Law and Procedure ⚖➝445**
15Ak445

**[7] Constitutional Law ⚖➝277(2)**
92k277(2)

**[7] Constitutional Law ⚖➝278.4(5)**
92k278.4(5)

**[7] Municipal Corporations ⚖➝218(8)**
268k218(8)

Due process rights of city personnel officer, who as classified employee with city had property right in his employment, were violated by pretermination hearing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

680 So.2d 229
(Cite as: 680 So.2d 229)

Page 2

in which city administrator and mayor served as hearing officers in case in which each testified as material witness and the holding of posttermination hearing before Review Board did not remedy, and could not have remedied, the earlier deprivation of officer's right to constitutionally adequate pretermination hearing. U.S.C.A. Const.Amend. 14.

*230 Kenneth L. Thomas and Cynthia W. Clinton of Thomas, Means & Gillis, P.C., Montgomery, for Appellant.

Lawrence M. Wettermark and Andrew J. Rutens of Collins, Galloway & Smith, Mobile, for Appellees.

Kenneth Smith, Counsel, Alabama League of Municipalities, Montgomery, for Amicus Curiae Alabama League of Municipalities (in support of the City of Evergreen's rehearing application).

Peter S. Joffrion, Office of the City Attorney, Huntsville, for Amicus Curiae City of Huntsville (in support of the appellees' rehearing application).

Mylan R. Engel and Edgar P. Walsh of Engel, Walsh & Zoghby, Mobile, for Amicus Curiae Mobile County Personnel Board (in support of the Appellees' rehearing application).

William R. Lauten, Mobile, for Amicus Curiae City of Mobile.

J.R. Brooks and William W. Sanderson, Jr. of Lanier Ford Shaver & Payne, P.C., Huntsville, for Amicus Curiae City of Rainbow City (in support of the City of Evergreen's rehearing application).

James W. Webb, Bart Harmon and Mary E. Pilcher of Webb & Eley, P.C., Montgomery, for Amicus Curiae Association of County Commissions of Alabama (in support of the Appellees' application for rehearing).

Alex L. Holtsford, Jr. and Marianne T. Cosse of Nix, Holtsford & Vercelli, P.C., Montgomery, for Amicus Curiae Alabama Municipal Insurance Corp.

James W. Porter II and Tessa M. Thrasher of Porter, Porter & Hassinger, P.C., Birmingham, for Amicus Curiae City of Leeds.

HOUSTON, Justice.

Freddie L. Stallworth sued for a judgment declaring the termination of his employment to be invalid.   He named as defendants the City of Evergreen; Henry Lomax Cassady, in his official capacity as mayor of Evergreen;   Curtis Hamilton, in his official capacity as Evergreen's city administrator;   and Jerry L. Caylor, James C. King, Phyllis N. Brock, Larry W. Fluker, and Elizabeth M. Stevens, in their official capacities as members of the Evergreen city council. He alleged certain unlawful employment practices in his termination from employment with the City.   The trial court entered a judgment for the defendants. Stallworth appeals.   We reverse and remand.

Stallworth was employed as personnel officer for the City and was responsible for maintaining employee records;   developing, maintaining, and updating job classification and pay plans;   and interpreting personnel policies for the City.   His job as personnel officer was under the merit system, and he could be terminated only for cause.   The mayor was the appointing authority for the City.   Hamilton, as the city administrator, *231 supervised the department heads and was Stallworth's immediate supervisor.

At an executive session of the city council, Stallworth was asked to explain certain payroll discrepancies, but he failed to provide an explanation. Consequently, Hamilton recommended that disciplinary action be taken against Stallworth.   The mayor concurred in that recommendation. Thereafter, by memorandum, Hamilton notified Stallworth that a hearing had been scheduled to consider his termination.   In a subsequent memorandum, Hamilton notified Stallworth of the charges against him and of the witnesses to be called against him.   At a pretermination hearing, Hamilton served as the hearing officer. Stallworth, who was represented by counsel, objected to Hamilton's serving as the hearing officer, because the City had been given notice that Stallworth would call Hamilton to testify at the hearing about his responsibilities as city administrator and because of a perceived lack of impartiality on Hamilton's part.   When Hamilton was called as a witness, the mayor took over as the hearing officer, over Stallworth's objection based on the City's having called the mayor as a witness against Stallworth at this hearing.   The City also called Councilman Caylor as a witness against Stallworth at this hearing.

Following the pretermination hearing, which lasted eight hours, the hearing officer determined that Stallworth had failed to provide an adequate explanation as to the payroll discrepancies. Following the hearing, the mayor and Hamilton, by

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

680 So.2d 229
**(Cite as: 680 So.2d 229, \*231)**

memorandum, advised Stallworth that he was being terminated from employment and advised him of his right to appeal to the Evergreen Personnel Review Board ("the Review Board"). The Review Board was created to serve in a quasi-judicial capacity as the appeal body to consider grievances by the City's regular classified employees and part-time employees. (Section II A, p. 4, Personnel Handbook.) The Review Board is comprised of five members (not City employees or holders of office in the City), who are appointed by council members. (See Section II B, p. 4, Personnel Handbook.) The employee is "allowed to appear before the [Review Board] with reasonable representation of [his] choice, if [he] desires." (Section IX B, Step 3(c), p. 30, Personnel Handbook.) The Review Board "will hear the employee's grievance, gather pertinent documents, interview witnesses as necessary, and prepare a written statement of fact." (Section IX B, Step 3(d), p. 31, Personnel Handbook.) Pursuant to an amendment to the Personnel Handbook, "[w]ithin ten (10) working days of the hearing, the Personnel Review Board will make a determination in the case," and "[t]he mayor and council will review cases heard before the Personnel Review Board and make the final determination." (Amendment to Section IX B, Step 3(e), p. 31, Personnel Handbook.)

A full evidentiary hearing was held before the Review Board. During the hearing, the City called the mayor as a witness, and it also called Hamilton and Caylor as witnesses. However, neither the mayor nor Hamilton or Caylor participated in the Review Board's deliberations. The Review Board voted 3-2 to affirm Stallworth's termination.

Thereafter, the city council convened to make the final determination as to Stallworth's termination, as authorized by the Personnel Handbook. Caylor abstained from voting on the issue of Stallworth's termination because, he said, he had participated in the pretermination and Review Board hearings. However, the mayor, in spite of his participation at the pretermination and Review Board hearings, voted to uphold Stallworth's termination. Some council members expressed concern over what they considered an inability to make an informed decision without reliable information--they had been excluded from the Review Board hearing and they had no tape-recording, transcript, or other evidentiary materials pertaining to Stallworth's termination proceedings other than the written findings of the Review Board. In response to these concerns, the city attorney explained that council members had been excluded

from the Review Board hearing because, he said, "if you had heard the Review Board proceedings, then you would be in no position to be sitting in the council's position, which is the third step." Thereafter, the city council, with Caylor \*232 abstaining, voted 3-2 to terminate Stallworth.

The trial court affirmed the city council's approval of Stallworth's termination, holding, in part, as follows:

"3. ... [T]he Evergreen ordinance creating the personnel system provides adequate procedural due process rights as enunciated in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994), because the personnel review board is composed of citizens of Evergreen appointed by the City Council members, by district, and provides for a 'de novo hearing.'

"4. The Evergreen ordinance envisions [that] the termination proceedings and the providing of due process rights would be overseen by the city personnel officer. The statutory scheme was skewed in the instant case because the very person in charge of protecting the employee's rights was the subject of the termination action. The only two city officials superior to the personnel officer were the city administrator [Hamilton] and the mayor [Cassady]. The court finds and determines that the pre-termination hearing was flawed from a due process standpoint because both reviewing officers testified against [Stallworth] and were not impartial. The personnel review board was not so affected and [Stallworth] received a de novo hearing from them. However, the court notes that the written findings of the individual personnel review board members are ambiguous in certain aspects. Nevertheless, the vote remains 3-2 to approve the termination.

"5. For purposes of this case, the major issue is what is the meaning of 'review' by the City Council of the personnel review board's action. The ordinance fails to specify any criteria for the manner of review or the applicable standard for review. At the very minimum, the terminated employee is entitled to have the termination decision reviewed by a fair and impartial group acting on reliable information.

"6. In the instant case, ... Cassady and Caylor had testified against [Stallworth] at the personnel review board hearing. In addition, Mayor Cassady had been the moving force behind the termination of the personnel officer and the person responsible for gathering most of the evidence. The court concludes that in the factual

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

setting of this case, the mayor [Cassady] and Councilperson Caylor were disqualified from voting to either affirm or reverse the decision of the personnel review board. While [Caylor] abstained from voting, Mayor Cassady did not.

"7. While the Council received no evidence nor reviewed the record made at the personnel review board hearing, the Council members had been supplied with memoranda and correspondence between [Stallworth], the Mayor [Cassady], and the City Administrator [Hamilton]. Such materials provided a basis for the council members to render an informed decision with respect to the affirmance or reversal of the personnel review board.

"8. After the court's nullifying the Mayor's vote, the City Council vote remains at 2-2. The court determines that logically the same rule should apply to the review of a personnel decision by a city council as applies to an appellate court's tie vote with respect to the decision of the trial court. It is well settled in Alabama that in the event of a tie vote on the appeal of a lower court's judgment, the judgment of the lower court is due to be affirmed.

"9. Therefore, the court concludes that since the City Council vote is 2-2, the decision of the personnel review board was due to be affirmed and that [Stallworth] is entitled to no relief."

Stallworth appeals, maintaining that his due process rights guaranteed by the United States Constitution and the Alabama Constitution were violated by Hamilton's participation as investigator, judge, and adverse witness in the pretermination hearing and as a witness at the Review Board hearing and by the mayor's participation as investigator, adverse witness, prosecutor, judge, and final decision-maker. Stallworth says the proceedings were tainted by bias and prejudgment and, therefore, that the mere cancellation of the mayor's vote at the city council hearing was insufficient to cure the due process violations.

*233 The City concedes that had the pretermination hearing been the only procedural protection given Stallworth, then Stallworth would not have had "meaningful due process." The City, nonetheless, maintains that because it afforded Stallworth the right to appeal to an independent, unbiased Review Board, which it says constituted a mechanism to redress the alleged due process deprivation, the fundamental requirement of due process was satisfied.

[1][2] The Fourteenth Amendment to the United States Constitution forbids a State or any subdivision thereof from taking a person's property without providing that person with due process of law. Building on earlier cases that had greatly expanded the meaning of the term "property" for Fourteenth Amendment purposes, the United States Supreme Court held in *Board of Regents v. Roth,* 408 U.S. 564, 576-78, 92 S.Ct. 2701, 2708-10, 33 L.Ed.2d 548 (1972), that a governmental employee's contractual or statutory right to continued employment was a property interest falling within the scope of the Fourteenth Amendment's protection. Therefore, "a state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for dismissal may demand the procedural protections of due process." *Goss v. Lopez,* 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975). All parties to this action concede that Stallworth had a protectible interest in continued employment with the City. The parties' sole disagreement concerns the constitutional adequacy of the review procedures provided to Stallworth by the City.

[3] "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Rest. Wkrs. U., Local 473, AFL-CIO v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748-49, 6 L.Ed.2d 1230 (1961). In the context of the routine dismissal of a governmental employee who has a legitimate right to continued employment absent sufficient cause for termination, the United States Supreme Court has held that "all the process that is due [to such an employee] is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547-48, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985)

Justice White, writing for the majority in *Cleveland Bd. of Educ.,* defined the constitutional boundaries of the required pretermination hearing stating:

"[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions-- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and

support the proposed action. See *Bell v. Burson,* 402 U.S., [535] at 540, 91 S.Ct. [1586] at 1590 [ (1971) ].

"The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, 'Some Kind of Hearing,' 123 U.Pa.L.Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."

470 U.S. at 545-46, 105 S.Ct. at 1495. (Citations omitted.)

Stallworth argues that the involvement of biased decision-makers throughout the termination review process afforded him by the City denied him due process of law. Uncontradicted testimony at trial established that the hearing officer at Stallworth's pretermination hearing was not only Stallworth's supervisor (Hamilton, the person who had initiated the procedures to have Stallworth terminated), but was also a material witness at the pretermination hearing, actually stepping down from being hearing officer long enough to testify.

[4][5] An unbiased and impartial decision-maker is one of the most, if not the most, *234 fundamental of requirements of fairness and due process. *Evans v. City of Huntsville,* 580 So.2d 1323 (Ala.1991). See also Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1279 (1975); and *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970). Although the hearing officer at a pretermination hearing need only determine whether there are "reasonable grounds to believe that the charges against the employee are true and support the proposed action," the most basic precepts of due process of law require that the person making that decision, the hearing officer, must be relatively unbiased and impartial. *Cleveland Bd. of Educ.,* 470 U.S. at 546, 105 S.Ct. at 1495. The United States Supreme Court in *Goldberg v. Kelly,* 397 U.S. at 271, 90 S.Ct. at 1022, recognized that the very nature of governmental entities will make it nearly impossible in many situations to find anyone within the governmental entity to serve as hearing officer who has been completely shielded from any contact with the subject matter of the proceeding, but the Court further stated that although "prior involvement in some aspects of a case will not necessarily bar" an official from serving as an hearing officer, "participat[ion] in making the determination under review" would bar such an official from serving as hearing officer. It also clearly offends the most basic traditional notions of due process to have a person serve as a hearing officer in a case in which he or she testifies as a material witness.

[6] The trial court recognized that the pretermination hearing afforded Stallworth was constitutionally deficient, but, relying on the case of *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994), cert. denied, *McKinney v. Osceola County Bd. of County Comm'rs,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), ruled that Stallworth had not been deprived of his right to procedural due process, because, it held, any procedural deficiency in the pretermination hearing was remedied by an adequate post-deprivation hearing. The trial court's reliance on *McKinney* is misplaced because the present case is clearly distinguishable and also because some of the reasoning underlying the holding in that case seems questionable in light of United States Supreme Court caselaw. Alabama Courts must apply Federal constitutional law as enunciated by the United States Supreme Court; caselaw from the various Federal circuit courts of appeals, although of invaluable aid in understanding Federal law as enunciated by the United States Supreme Court, is only persuasive authority in our state courts.

The plaintiff in *McKinney* filed an action under 42 U.S.C. § 1983 after his dismissal from employment. He "failed to take advantage of any state remedies, opting instead to pursue his claim in federal court." *McKinney,* 20 F.3d at 1563. Unlike the plaintiff in *McKinney,* Stallworth chose to pursue a remedy in the state courts. The Court of Appeals for the Eleventh Circuit based its holding that McKinney was not entitled to § 1983 relief not only on a conclusion that any due process problems with McKinney's pretermination hearing had been remedied by an adequate post-deprivation hearing, but also on this conclusion:

"Florida courts indeed do have the power to review employment termination cases. Inherent in that power to review is the power to remedy deficiencies and to cure violations of due process. Therefore, the Florida courts have the authority to order the relief to which McKinney claims to be entitled--a new hearing conducted by a fair tribunal.

"... [T]he scope of the Florida courts' review

encompasses the claim McKinney brought in federal court.... The Florida circuit courts, on certiorari review, possess broad powers of review.... [See] *City of Deerfield Beach v. Vaillant,* 419 So.2d 624, 626 (Fla.1982)."

*McKinney,* 20 F.3d at 1563. (Citations omitted.)

Furthermore, the Eleventh Circuit's reliance on *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to buttress its conclusion in *McKinney* that a denial of due process at the pretermination level can be fully remedied by a procedurally adequate post-termination hearing is questionable. *Parratt* involved a procedural due process claim brought by a prisoner who alleged that a prison employee had either negligently lost or intentionally stolen his personal property. The prisoner in *Parratt* asserted that a post-deprivation hearing in which he could seek *235 tort damages was constitutionally insufficient, arguing that he should have been provided with a predeprivation hearing, also. Naturally, the United States Supreme Court recognized that a predeprivation hearing in that sort of situation would be impossible, because a State cannot predict when a prison employee will negligently misplace or decide to steal a prisoner's property. The situation where an employee is terminated is much different.

In *Cleveland Board of Education,* 470 U.S. 532 at 547-48, 105 S.Ct. 1487 at 1496-97, the United States Supreme Court recognized that predeprivation hearings were practicable in the context of employment terminations; that context is very different from the situation in *Parratt.* The Supreme Court held in *Cleveland Board of Education* that tenured governmental employees almost always must be afforded at least a limited pretermination hearing before they can constitutionally be terminated. To hold that a procedurally adequate post-termination hearing remedies the deprivation inflicted on a discharged employee by an earlier decision based on a pretermination hearing completely devoid of due process of law would be to render the United States Supreme Court's holding in *Cleveland Board of Education* a nullity. Furthermore, no matter how fair and adequate the procedures at the post-termination hearing may be, the initial decision made after the pretermination hearing inevitably will have diminished significantly the employee's chances of prevailing at the post- termination hearing.

[7] Based on the foregoing, we hold that Stallworth,

who as a classified employee with the City had a property right in his employment, was denied the process he was due. It is undisputed that Stallworth's pretermination hearing was flawed. The holding of the post-termination hearing before the Review Board did not remedy and could not have remedied the earlier deprivation of Stallworth's right to a constitutionally adequate pretermination hearing; this is the case whether or not the trial court's holding that Stallworth was afforded a constitutionally adequate post-deprivation hearing was correct. [FN1]

FN1. The hearing before the Review Board would have comported with the independent due process requirement of an adequate post-termination hearing if the Review Board had been the final arbiter of Stallworth's termination. However, the city council, pursuant to the Personnel Handbook, was assigned the role of making that final determination. Therefore, review before the city council would have had to be in the form of an evidentiary hearing and would have had to be conducted without the presence of members who taint the proceeding, in order to comport with due process. To do otherwise would create a situation that would lead a council member not to hold the balance nice, clear, and true. See, e.g., *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).

"[W]hile the influence of any single participant ... can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the ... ultimate disposition. The participation of [one] who has [an] interest in the outcome of the case of which he knows at the time he participates *necessarily* imports a bias into the deliberative process. This [constitutes a deprivation] of the assurance of impartiality that is the fundamental requirement of due process."
475 U.S. at 831, 106 S.Ct. at 1590 (Justice Brennan, concurring). (Emphasis in original.)

REVERSED AND REMANDED.

HOOPER, C.J., and ALMON, COOK, and BUTTS, JJ., concur.

680 So.2d 229, 11 IER Cases 1197

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

84 F.Supp.2d 1317
**(Cite as: 84 F.Supp.2d 1317)**

United States District Court,
M.D. Alabama,
Southern Division.

**T BACKS CLUB, INC., et al., Plaintiffs,**
v.
**Jimmy SEATON, et al., Defendants.**

**No. Civ.A. 99-D-1140-S.**

Jan. 5, 2000.

Operators of exotic dancing establishment filed motion to reconsider denial of preliminary injunction against revocation of their business license. The District Court, DeMent, J., held that: (1) plaintiffs lacked standing to challenge constitutionality of Alabama statute requiring a special operating license for adult business establishments; (2) ordinance establishing procedure for revocation of business license was not facially invalid under First Amendment; and (3) ordinance was not an unconstitutional prior restraint.

Motion denied.

West Headnotes

**[1] Injunction ⬤═9**
212k9

District court may grant injunctive relief if the movant shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the threatened harm the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

**[2] Injunction ⬤═132**
212k132

**[2] Injunction ⬤═147**
212k147

Preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites.

**[3] Federal Civil Procedure ⬤═103.2**
170Ak103.2

Standing is a preliminary jurisdictional matter which a trial court resolves, sua sponte, without considering the likelihood of success on the merits.

**[4] Federal Civil Procedure ⬤═103.2**
170Ak103.2

**[4] Federal Civil Procedure ⬤═103.3**
170Ak103.3

To establish standing, a plaintiff must, at a minimum, show that he or she has suffered a concrete and particularized injury, resulting from the action challenged, that is likely to be redressable in a judicial action.

**[5] Federal Civil Procedure ⬤═103.2**
170Ak103.2

If the standing requirements are not met, a federal court is precluded from exercising jurisdiction over the matter before it.

**[6] Constitutional Law ⬤═70.1(1)**
92k70.1(1)

Because of the fundamental doctrine of separation of powers, standing inquiries must be especially rigorous when court is asked to determine the constitutionality of a legislative enactment.

**[7] Constitutional Law ⬤═42.1(6)**
92k42.1(6)

Operators of exotic dancing establishment, whose only alleged injury was revocation of their business license, lacked standing to challenge constitutionality of Alabama statute requiring a special operating license for adult business establishments where they failed to allege any causal relationship whatsoever between the enforcement of the statute and the revocation of their license. Ala.Code 1975, § 13A-12-200.12.

**[8] Federal Civil Procedure ⬤═103.2**
170Ak103.2

To have standing, a plaintiff must show that he or she has suffered an invasion of a legally protected interest which is concrete and particularized.

**[9] Constitutional Law ⬤═42.2(1)**
92k42.2(1)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

84 F.Supp.2d 1317
(Cite as: 84 F.Supp.2d 1317)

Overbreadth doctrine allows a plaintiff to circumvent traditional standing requirements when facially attacking a statute on First Amendment overbreadth grounds because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression. U.S.C.A. Const.Amend. 1.

**[10] Constitutional Law** ☜➡90.4(3)
92k90.4(3)

**[10] Theaters and Shows** ☜➡2
376k2

Alabama statute that prohibited any business establishment or private club from showing for entertainment purposes human genitals, pubic area, or buttocks with less than fully opaque covering, or showing of female breast with less than fully opaque covering of any portion thereof below top of nipple, was not facially invalid content-based restriction on protected expression in violation of First Amendment. U.S.C.A. Const.Amend. 1;   Ala.Code 1975, § 13A-12- 200.11.

**[11] Constitutional Law** ☜➡90.4(1)
92k90.4(1)

**[11] Obscenity** ☜➡2.5
281k2.5

Alabama statute that prohibited operation of "adult-only" enterprises within 1,000 feet of, inter alia, church, public park, public or private school, or private residence, was not overbroad, facially invalid content-based restriction on protected expression in violation of First Amendment, either under time, place, and manner analysis or secondary effects analysis. U.S.C.A. Const.Amend. 1;  Ala.Code 1975, § 13A-12-200.5.

**[12] Injunction** ☜➡123
212k123

District court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit.

**[13] Constitutional Law** ☜➡90.4(3)
92k90.4(3)

**[13] Theaters and Shows** ☜➡3.50

376k3.50

Ordinance establishing procedure for revocation of business license was not facially invalid under First Amendment;  ordinance, which was applied to exotic dancing establishment, was a law of general application that regulated unlawful conduct and was not specifically targeted at any form of protected speech or expression.   U.S.C.A. Const.Amend. 1; Daleville City, Ala., Code § 6-15.

**[14] Constitutional Law** ☜➡90.4(3)
92k90.4(3)

**[14] Theaters and Shows** ☜➡3.50
376k3.50

Ordinance establishing procedure for revocation of business license was not an unconstitutional prior restraint where reasons for revocation of license of exotic dancing establishment had no relationship to protected activities; license was revoked for operating without a health permit, obtaining license under false pretenses, under-paying taxes and other violations of city code. U.S.C.A. Const.Amend. 1;  Daleville City, Ala., Code § 6-15.

***1319** J. David Robinson, Daleville, AL, for plaintiff.

Henry B. Steagall, III, Ozark, AL, for defendant.

### *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is Plaintiffs' Motion To Reconsider Denial Of Preliminary Injunction ("Mot.") and Plaintiffs' Memorandum Brief In Support Of Motion To Reconsider Denial Of Preliminary Injunction ("Pl.s' Br."), both filed November 5, 1999.    On November 17, 1999, Defendants filed a Brief In Opposition To Plaintiffs' Motion To Reconsider ("Def.s' Br.").    After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Plaintiffs' Motion is due to be denied.

### JURISDICTION

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution of the United States.   Additionally, the court has original subject matter jurisdiction over this

matter, pursuant to 28 U.S.C. § 1343(a)(3) because this is an action to redress the alleged deprivation of federal constitutional rights under color of state statute and city ordinance. The Parties do not contest personal jurisdiction or venue.

## PRELIMINARY INJUNCTION STANDARD

[1][2] A district court may grant injunctive relief if the movant shows the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the threatened harm the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (citing *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to the [aforementioned] four requisites." *McDonald's Corp.,* 147 F.3d at 1306 (citations omitted); *see also Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994) ("The district court 'must exercise its discretion in light of the four prerequisites for extraordinary relief of a preliminary injunction.' ") (quoting *Nnadi v. Richter,* 976 F.2d 682, 690 (11th Cir.1992)). "The grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *Sierra Club v. Georgia Power Co.,* 180 F.3d 1309, 1310 (11th Cir.1999) (citing *United *1320 States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983).

## FACTUAL BACKGROUND AND
## PROCEDURAL HISTORY
The Parties have stipulated to the following facts: [FN1]

> FN1. On October 25, 1999, the Parties submitted a Joint Stipulation of Facts ("Jt.Stip. of Facts"). The court has made minor grammatical changes therein, but nothing of substance has been altered.

1. Plaintiff T-Backs ("T-Backs") is a nightclub/lounge with a Daleville restaurant license and a retail liquor license issued by the State of Alabama. T-Backs is located within the municipal limits of the City of Daleville and is an Alabama corporation which is operated by Plaintiff Paul B. Connolly ("Connolly").

2. Since June 16, 1996, T-Backs operated as a nightclub/lounge that offered erotic dancers wearing G-strings and breast coverings, but without topless or nude dancing, under Daleville business license No. 19990366 which was issued November 2, 1998. The address of the stated business is 794 Highway 84 East, Post Office Box 597, Daleville, Alabama.

3. On June 18, 1999, Connolly, on behalf of T-Backs erected a common wall to divide the nightclub/lounge into two sections. Both sections have separate addresses, and entrances. Connolly continued the operation of T-Backs with the sale of food and alcohol, but named the new section "Fantasies" and discontinued the sale of alcohol therein. Connolly then obtained a separate address (through E911 director Major Goodway) for Fantasies and applied to the City of Daleville for a separate business license.

4. On June 18, 1999, Connolly approached the Administrative Clerk for the City of Daleville and advised her that he was opening a new business named "Fantasies," wherein he would not serve alcohol, but would serve prepackaged food. Connolly signed an application for T-Backs Club, Inc., D.B.A. Fantasies. Based on this discussion, the City issued a restaurant license to Connolly for Fantasies under separate Business License No. 19990561 ("Fantasies' license") on June 21, 1999.

5. Daleville's ordinance requires that a restaurant license application be accompanied by a health permit. At the time of the application for the Fantasies business license, no health department permit was presented to the Administrative Clerk because it was believed by the parties that no permit was necessary because the sale of food was strictly limited to "pre-packaged food." The Administrative Clerk was not informed that topless or nude dancing would take place in Fantasies.

6. After the issuance of the Fantasies business license, topless and totally nude female dancing began being performed. Alcohol continued to be served at T-Backs, but no alcohol was served in Fantasies. Nonalcoholic drinks were mixed, blended and dispensed in Fantasies along with ice, which was scooped from an ice chest.

7. T-Backs customers are allowed to consume alcohol and customarily enter Fantasies through a door in the common wall. Once inside Fantasies, the customer is allowed to view topless and nude dancing for an entry fee. For an additional fee, a customer can enter a small alcove room where a

"private dance" can be had by a totally nude dancer.

8. Although Fantasies has a separate outside entrance, an exterior sign on the door states that customers should "enter through T-Backs." *1321 Fantasies has lighted neon beer signs on the window.

9. Connolly pays 3% gross receipts tax to the State Department of Revenue, which is then paid to the City of Daleville. Connolly is responsible for reporting his true and accurate gross receipts to the State Department of Revenue each month. His report is made for the T-Backs Corporation which also includes the revenues of Fantasies. For the month of July 1999, Connolly reported $3,363 as gross receipts for T-Backs and Fantasies combined. Connolly acknowledges in his affidavit filed with this court that he actually brought in $4,035 from door revenues from 807 customers just on Fantasies alone in the month of July, 1999.

10. On August 10, 1999, after conducting an investigation of Fantasies, the City of Daleville police obtained warrants and arrested Connolly for violating § 13A-12-200.11 of the Alabama Code, which prohibits totally nude dancing. Also, three dancers at Fantasies were arrested on criminal charges for public lewdness, in violation of Alabama Code § 13A-12-130. Plaintiffs filed a Motion to Stay Prosecution of Connolly in the Dale County District Court. The case was transferred to the Circuit Court of Dale County and Judge P.B. McLauchlin issued the Stay.

11. On September 30, 1999, the Daleville City Council, at a special meeting, issued a notice of proposed revocation of the Fantasies Business License No. 19990561. Connolly's attorney accepted service of the written notice at the Council meeting.

12. On October 14, 1999, a public due process hearing was held before the Daleville City Council with Connolly and his attorney present who cross examined the witnesses, introduced a document and presented arguments to the Council. Connolly did not testify or call any witnesses.

At the hearing, the following witnesses testified in favor of revocation:

A. *Administrative Clerk who issued the business license to Fantasies:* She testified that Connolly had requested a "coffee shop" license and represented that he would serve "pre-packaged food." Connolly did not present a health department permit and did not reveal that topless or nude dancing would be conducted at Fantasies. The Administrative Clerk further testified that Connolly had stated that he did not need a restaurant license because he would only dispense prepackaged food, but a restaurant license was the only thing available for a coffee shop.

B. *Inspector for the Department of Health:* He testified that he had inspected Connolly's building, but had not been made aware that T-Backs considered Fantasies as a separate business. He testified that any business that dispenses, mixes, or blends drinks, or dispenses ice with a scoop, must have a health permit. Therefore, Fantasies should have had a "limited restaurant" health permit. Consequently, the operation of Fantasies without such a permit violated State law. He also testified that Fantasies does not have a double sink, appropriate floors and walls, and other requirements, and could not be approved for a health permit at that time. He also stated that he had seen the signs for Fantasies inside T-Backs, but did not realize Connolly operated two businesses from that structure. He stated that he customarily allows businesses to continue to operate for a short period of time until they comply.

*1322 C. *Police investigator:* He testified about the layout of the building, the nude dancing and intimate physical contact between the dancers and customers. He witnessed a totally nude dancer on stage place her legs over the shoulders of a customer and then thrust her crotch closely up to the face of the customer.

D. *Police Chief:* He testified that the common wall is just a sham to get around Daleville's ordinance prohibiting alcohol and nude dancing in the same place. He testified that no prepackaged food was found on the Fantasies premises upon several inspections by City and State investigators and police. He identified photos of the signs on the door and windows of Fantasies. Next, he testified about customers who were provided alcohol and then would merely step through the partition door to view a dance and then return to drinking in the bar. He further testified that Connolly reported gross receipts to the Department of Revenue in the amount of $3,363 for July, 1999. However, the Police Chief then described how an affidavit submitted by Plaintiffs in this case showed that in fact Connolly had collected receipts in July, 1999, of $4,035 from door revenues from Fantasies alone, which constitutes falsifying

revenue reports on Plaintiffs' business. The Police Chief stated that several businesses in Daleville had problems with taxes before, but he did not recall any license revocations for this reason during his term as Chief of Police (3 years). He stated that prior to the Notice of Revocation, Connolly had not been served with notice of tax violations, but the Chief stated that he was not aware of the tax violations until after he saw Connolly's affidavit submitted in the instant case. He further stated that to the best of his knowledge, every lounge, nightclub, and convenience store in Daleville that dispenses food or ice (other than prepackaged food) has a restaurant license. He stated that Daleville is a military town and his training and experience as a policeman and a military policeman from other places and towns, indicated that the conduct and activities at Fantasies will lead to potential violence, assaults on women, disease, prostitution, and other criminal acts although he was not able to identify any specific complaints with respect to that type of activity at Connolly's business. He testified that these activities are against the public health and morals; the procurement of a license under false pretenses violates Alabama Code § 40-12-8; the combination of nude dancing and alcohol in the same structure violates Daleville Code § 3-27; the under reporting of gross receipts violates Daleville Code § 6-9; the failure to obtain a health permit for Fantasies violates Daleville Code § 6-10; allowing intimate physical contact between nude dancers and customers is a nuisance and against public health and morals. He requested the Council revoke the business license of Fantasies.

13. At the close of the evidence, the Council and Mayor voted unanimously to revoke the Fantasies Business License No. 19990561 pursuant to Daleville Code §§ 6-14 and 6-15. The license of T-Backs (No. 19990366) is not affected and T-Backs can return to its former operation.

(Jt.Stip. Of Facts, Def.s' Ex. 1.)

After the October 14, 1999 public due process hearing, Plaintiffs closed Fantasies. On October 21, 1999, Plaintiffs filed with this court a Motion For Temporary Restraining Order And Preliminary Injunction ("Mot. For Inj. Relief"). In said Motion, Plaintiffs requested that "the Defendants*1323 be temporarily restrained from the following activities":

A. enforcing the Revocation Order of the Daleville City Council issued October 14, 1999,

against Fantasies.

B. interfering with the Plaintiffs' business.

C. harassing the Plaintiff, his Customers, or Entertainers.

(Mot. For Inj. Relief at 5.) In support of their Motion For Injunctive Relief, Plaintiffs vaguely set forth the following arguments: (1) denial of Plaintiffs' right of freedom of speech; (2) lack of adequate procedural safeguards within Daleville's revocation ordinance; and (3) violation of Plaintiffs' due process rights. (Id. at 2-4.) Additionally, Plaintiffs made cursory reference to their original Complaint, wherein they challenge the constitutionality of the following Alabama statutes: (1) Alabama Code § 13A-12-200.5(4); (2) Alabama Code § 13A-12-200.11; and (3) Alabama Code § 13A-12-200.12. (Compl. at 8-9.)

On October 21, 1999, the court conducted a conference call wherein counsel for Plaintiffs and Defendants agreed that the revocation of Plaintiffs' business license would not be enforced before a hearing on Plaintiffs' Motion For Injunctive Relief was held. Based upon this agreement, the court denied as moot Plaintiffs' Motion For Temporary Restraining Order and scheduled a hearing on Plaintiffs' Motion For Preliminary Injunction and/or Hearing On The Merits. The court invited each Party to submit a brief prior to said hearing, but only Defendants responded by submitting a Preliminary Brief ("Def.s' Prelim. Br.") on October 25, 1999.

On October 26, 1999, the court conducted a Preliminary Injunction Hearing and/or Hearing On The Merits wherein Plaintiffs and Defendants argued and presented evidence regarding Plaintiffs' Motion For Preliminary Injunction. See Appendix A (Transcript of October 26, 1999 Preliminary Injunction Hearing and/or Hearing On The Merits.) After hearing all of the evidence, the court found that Plaintiffs had not established a substantial likelihood of success on the merits. (Id. at 62-69.) Accordingly, based on the reasons set forth by the court at the conclusion of the Preliminary Injunction Hearing, the court entered an Order on October 28, 1999 denying Plaintiffs' Motion For Preliminary Injunction. In the same Order, the court, upon Plaintiffs' request, set forth a briefing schedule regarding the instant Motion To Reconsider. Having received briefs from Plaintiffs and Defendants, the court now considers Plaintiffs' Motion To Reconsider Denial Of Preliminary Injunction.

## DISCUSSION

At the outset, the court notes that the Parties have made the court's task extremely difficult. Plaintiffs' claims have been poorly pleaded, poorly briefed, and were poorly argued at the Preliminary Injunction Hearing, making it arduous to ascertain the theories of their case. Moreover, while the court recognizes that Plaintiffs' pleadings complicated Defendants' ability to know the precise grounds upon which to base their defense, Defendants' arguments have nonetheless been cursory and general. However, the court herein attempts to construe and examine Plaintiffs' claims in an effort to determine whether Plaintiffs are entitled to preliminary injunctive relief.

## I. Constitutional Challenges To State Statutes

The court begins its analysis by examining the claims set forth in Plaintiffs' Complaint, filed September 24, 1999. In their Complaint, Plaintiffs seek declaratory and injunctive relief "pursuant to 42 U.S.C. Section[s] 1983 and 1988 based on the continued enforcement of facially unconstitutional statutes recently enacted" by the Alabama legislature. (Compl. at 1.) Specifically, Plaintiffs challenge the facial validity of the following Alabama criminal statutes: (1) Alabama Code § 13A-12-200.12; (2) Alabama Code § 13A-12-200.11; and (3) Alabama Code § 13A-12- *1324 200.5(4). (Compl. at 4-5.) Based on the reasons set forth herein, the court finds that Plaintiffs have not established a substantial likelihood of succeeding on the merits and, thus, preliminary injunctive relief is not warranted. *See generally Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994) (holding that when a claimant fails to establish a substantial likelihood of success on the merits, a court may properly deny claimant's motion for preliminary injunction without addressing the other three prerequisites of preliminary injunctive relief).

### A. Alabama Code § 13A-12-200.12

Plaintiffs contend that the following provisions of § 13A-12-200.12 are facially invalid because they "violate the First and Fourteenth Amendments to the U.S. Constitution" (Compl. at 5):

(a) Any business establishment that operates as an "adult bookstore," "adult movie house," "adult video store," or other form of adult-only entertainment enterprise shall obtain in addition to any licenses required by existing law a special operating license, except that a video rental store that does not engage predominantly in and whose principle [sic] business is not the sale or rental of

adult material, if it is maintained in compliance with Section 13A-12-200.5(2) or is located in an area restricted to adults. Persons who apply for the license shall provide on the application detailed information concerning ownership and financing, and pay an investigation fee of five hundred dollars ($500) to the county or municipality wherein the business establishment will be located.

(b) If granted the license, the local government, in its discretion, may restrict the type of advertisement that the business establishment can display outside the establishment.

(c) The license shall be revoked if the business establishment is convicted of violating this division.

ALA CODE § 13A-12-200.12 (1998 Supp.).

Plaintiffs claim that this statute is facially invalid because it lacks adequate procedural safeguards and places unbridled discretion in the hands of public officials to deny permission to engage in constitutionally protected expression. (Pl.s' Br. at 11.) While Plaintiffs' cursory challenge to § 3A-12-200.12 may have some merit, the court will not entertain said challenge at this stage of the litigation because Plaintiffs have not established or even addressed whether or not they have standing to bring such a claim.

[3][4][5][6] "Standing is a preliminary jurisdictional matter which a trial court resolves, [sua sponte], without considering the likelihood of success on the merits." *E.F. Hutton v. Hadley,* 901 F.2d 979, 983 (11th Cir.1990); *see also English v. Talladega Co. Bd. of Educ.,* 938 F.Supp. 775, 784 (N.D.Ala.1996) ("Standing is part of the 'case or controversy' jurisdictional requirement of Article III, and this Court has the obligation to examine it sua sponte.") To establish standing, a plaintiff must, at a minimum, show that he or she has suffered a concrete and particularized injury, resulting from the action challenged, that is likely to be redressable in a judicial action. *See Alabama v. United States Envtl. Protection Agency,* 871 F.2d 1548, 1554 (11th Cir.1989) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that the plaintiff bears burden of establishing standing). If the standing requirements are not met, a federal court is precluded from exercising jurisdiction over the matter before it. *See Alabama,* 871 F.2d at 1554 ("Standing is a jurisdictional prerequisite to suit in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

federal court.") (citing *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 475-76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Because of the fundamental doctrine of separation of powers, standing inquiries must be "especially rigorous" when, as here, the **\*1325** court is asked to determine the constitutionality of a legislative enactment. *Raines v. Byrd,* 521 U.S. 811, 819-20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). These well-established standing requirements "reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma,* 413 U.S. 601, 610-11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

[7][8] As noted earlier, neither Plaintiffs nor Defendants have even broached the issue of whether Plaintiffs have standing to challenge § 13A-12-200.12. However, the court finds, sua sponte, that Plaintiffs have not met the traditional standing requirements, set forth above, as to their § 13A-12-200.12 claim because Plaintiffs have failed to show or even allege any relationship between the challenged statute and their claimed injury. Indeed the only concrete injury that Plaintiffs clearly allege is the revocation of the Fantasies' license. [FN2] Plaintiffs fail to establish any causal relationship whatsoever between the enforcement of § 13A-12-200.12 and the revocation of the Fantasies' license. In other words, Plaintiffs do not show that their alleged injury resulted from the challenged statute. Consequently, Plaintiffs fail to establish that a judicial action concerning § 13A-12- 200.12 would likely redress their alleged injury. Accordingly, the court finds that Plaintiffs have not met the traditional requirements of standing.

> FN2. To have standing, a plaintiff must show that he or she has suffered "an invasion of a legally protected interest which is ... concrete and particularized." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. In this case, the only concrete and particularized injuries that Plaintiffs allege relate to the revocation of the Fantasies' license and the loss of revenue caused by said revocation. Plaintiffs' vague claims concerning the alleged infringement upon their First Amendment rights will be addressed subsequently in this opinion.

[9] However, the United States Supreme Court has established a very limited exception to the traditional

standing requirements in the context of "First Amendment challenges to statutes based on First Amendment overbreadth." *Los Angeles Police Dep't. v. United Reporting Publ'g Corp.,* No. 98-678, 120 S.Ct. 483, 1999 WL 1100446, *4 (U.S. December 7, 1999). This narrow exception, known as the overbreadth doctrine, allows a plaintiff to circumvent traditional standing requirements when facially attacking a statute on First Amendment overbreadth grounds " 'because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression.' " *See id.* at *4-5 (quoting *Gooding v. Wilson,* 405 U.S. 518, 520-21, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)). In other words, because of the significant concerns associated with the wrongful proscription of constitutionally protected speech, the overbreadth doctrine permits a plaintiff, in certain circumstances, to facially challenge an overly broad statute that restricts protected speech, even though the challenged statute has not been unconstitutionally applied to said plaintiff.

Nevertheless, even assuming that Plaintiffs' facial attack of § 13A- 12-200.12 is based on First Amendment overbreadth, which is not readily apparent from the pleadings, the court remains unpersuaded that Plaintiffs are entitled to bring this claim because the overbreadth doctrine is "strong medicine" that is to be employed "with hesitation and then only as a last resort." *Id.* at *5 (citing *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908). Furthermore, the overbreadth doctrine's "application becomes more unlikely as the allegedly chilled expression 'moves from pure speech toward conduct and that conduct--even if expressive--falls within the scope of otherwise valid criminal laws.' " *Geaneas v. Willets,* 911 F.2d 579, 586 (11th Cir.1990) (quoting *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908). Here, the allegedly chilled expression is nude dancing, which rests "at a pronounced distance from the 'pure speech' at the First Amendment's core...." *Geaneas,* 911 F.2d at 586; *see* **\*1326** *also Barnes v. Glen Theatre,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (holding that nude dancing involves only the barest minimum of protected expression under the "outer perimeters of the First Amendment"). Therefore, it is doubtful that Plaintiffs can utilize the overbreadth doctrine to overcome their lack of standing to challenge § 13A-12-200.12.

In any event, Plaintiffs fail to even address the issue

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of whether they have standing to challenge § 13A-12-200.12, much less the issue of whether the overbreadth doctrine is applicable. Thus, the court is extremely hesitant to find that Plaintiffs have a substantial likelihood of succeeding on the merits of this challenge when it is unclear whether Plaintiffs are even entitled to bring said challenge. Moreover, " 'preliminary injunctions of legislative enactments ... must be granted reluctantly and only upon a clear showing that the injunction ... is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.' " *Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994) (quoting *Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)). Because Plaintiffs have failed to establish standing to challenge § 13A-12-200.12, the court finds that Plaintiffs have not made a clear showing that an injunction is definitely demanded by the Constitution. Therefore, based on the foregoing, the court finds that preliminary injunctive relief is not appropriate regarding Plaintiffs' challenge to § 13A-12-200.12.

## B. Alabama Code § 13A-12-200.11

[10] Next, Plaintiffs challenge the constitutionality of the following provisions of § 13A-12-200.11, claiming that said provisions impose "a content-based restriction on protected expression in violation of the First Amendment to the U.S. Constitution made applicable to Alabama through the Fourteenth Amendment" (Compl. at 4):

It shall be unlawful for any business establishment or any private club to show or allow to be shown for entertainment purposes the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. A violation of this section shall be a Class C felony.

ALA CODE § 13A-11-200.11 (1998 Supp.).

The court notes, once again, that Plaintiffs fail to address the issue of whether they have standing to bring this claim. However, assuming, without deciding, that Plaintiffs could establish the requisite standing to challenge § 13A-12-200.11, the court finds that Plaintiffs are unable to establish a substantial likelihood of success on the merits based on the reasoning set forth in *Ranch House v.*

*Amerson,* 22 F.Supp.2d 1296 (N.D.Ala.1998). [FN3] In *Ranch House,* the owner of an exotic dancing establishment challenged the constitutionality of § 13A-12-200.11 based upon the same grounds that Plaintiffs now assert. *Id.* at 1298. After a detailed constitutional analysis of the contested statute, the *Ranch House* court found that § 13A-12-200.11 passed constitutional "muster." *Id.* at 1299-1310. This court agrees with the decision in *Ranch House* and, thus, based on the reasons set forth in that opinion, the court finds that Plaintiffs fail to show a substantial likelihood of success on the merits of their § 13A-12-200.11 claim. Accordingly, the court finds that preliminary injunctive relief is inappropriate as to this claim.

> FN3. The court notes that *Ranch House v. Amerson* is currently on appeal in the Eleventh Circuit.

## *1327 C. Alabama Code § 13A-12-200.5(4)

[11] Finally, Plaintiffs challenge the constitutionality of the following provision of § 13A-12-200.5, claiming that said provision "facially violates the First and Fourteenth Amendments to the U.S. Constitution" (Compl. at 4):

(4) It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, daycare center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail for not more than one year.

ALA CODE § 13A-11-200.5(4) (1998 Supp.).

The court notes that, yet again, Plaintiffs fail to address the issue of whether they have standing to bring this claim. However, assuming, without deciding, that Plaintiffs could establish the requisite standing to challenge § 13A-12-200.5(4), the court finds that Plaintiffs are unable to establish a substantial likelihood of success on the merits because of the reasoning set forth in *Ranch House v. Amerson,* 22 F.Supp.2d 1296 (N.D.Ala.1998). In *Ranch House,* the owner of an exotic dancing establishment challenged the constitutionality of §

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

13A-12-200.5 based upon the same grounds that Plaintiffs now assert. *Id.* at 1298. After a comprehensive constitutional analysis of the contested statute, the *Ranch House* court found that § 13A-12-200.5, in its entirety, "is facially valid and is not overbroad." *Id.* at 1306-1310. This court, as previously stated, agrees with the decision in *Ranch House* and, thus, based on the reasons set forth in that opinion, the court finds that Plaintiffs fail to show a substantial likelihood of success on the merits of their § 13A-12-200.5(4) claim. Accordingly, the court finds that preliminary injunctive relief is inappropriate as to this claim.

In sum, Plaintiffs have not demonstrated that they have standing to challenge these state statutes, much less that they have a substantial likelihood of succeeding on the merits of these challenges. Moreover, Plaintiffs have failed to distinguish or even discuss the *Ranch House* opinion, which upholds two of the three statutes that Plaintiffs are challenging. Accordingly, the court finds that preliminary injunctive relief is not warranted as to Plaintiffs' constitutional challenges to the aforementioned state statutes.

## II. Constitutional Challenge To City Ordinance

The court now turns to Plaintiffs' remaining claims concerning § 6-15 of the Daleville City Code ("§ 6-15"), which provides as follows:

Sec. 6-15. [Revocation]--Procedure.
    The following procedure shall govern the manner in which any license shall be revoked:
    (1) The city council shall, on its own initiative or upon the oral or written complaint of one or more persons that any licensee in the city or within the police jurisdiction thereof, is operating any exhibition, trade, business, vocation, occupation or profession in an illegal manner or in such a manner as to be detrimental to public morals or health, or so as to constitute a nuisance, give at least five (5) days' notice in writing to be served on such licensee, or an agent or officer thereof, requiring such licensee to appear before the council at a time and place specified in the notice for the purpose of showing cause, if any, why the license should not be revoked. The notice shall specify the grounds upon which such revocation is proposed.
    (2) At the hearing provided for in subsection (1), such licensee shall have the **\*1328** right to introduce witnesses and evidence in his behalf;

and the council shall hear all witnesses and evidence in support of the revocation of such license.
    (3) If, after the hearing, a majority of the council shall be of the opinion that such license is operating or has within six (6) months operated such exhibition, trade, business, vocation, occupation or profession in an illegal manner or in such a manner as to be detrimental to public morals or health, or as to constitute a nuisance, then by resolution the council shall forthwith revoke the license of such license. No refund of any revoked license shall be made.
    (4) If, after receiving such written notice, such licensee, or a duly authorized representative thereof, shall fail to appear before the council at the time and place fixed for the hearing, or to which the same has been continued, then the council shall hear and consider evidence in support of the proposed revocation, and shall have the right to take the action authorized in subsection (3) above. (Ord. No. 7-20-77, Art. I, § 14, 7-20-77).

  DALEVILLE, ALA., CODE § 6-15 (1977).

[12][13] Plaintiffs do not mention § 6-15 in their Complaint, but refer to it for the first time in their Motion For Preliminary Injunction. However, for the purposes of the instant Motion, the court will address Plaintiffs' claims as to § 6-15, which are summarized as follows:

> FN4. "A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit," *Kaimowitz v. Orlando, Fl.,* 122 F.3d 41, 43 (11th Cir.1997). However, the court will entertain Plaintiffs' challenge to § 6-15 because, like the claims asserted in the Complaint, this challenge is based upon First Amendment grounds and, therefore, is not "wholly outside the issues in the suit." *Id.*

**The Ordinance in question is invalid on its face due to its failure to provide judicial access. [FN5]**

> FN5. Plaintiffs primarily contend that § 6-15 is unconstitutional on its face because the ordinance does not explicitly provide for access to prompt judicial review of revocation decisions made by the Daleville City Council. (Pl.s' Br. at 6; App. A at 70.) In support of this contention, Plaintiffs rely

on the following cases: (1) *Freedman v. State of Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); (2) *FW/PBS v. City of Dallas,* 493 U.S. 215, 220, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); and (3) *Boss Capital v. City of Casselberry,* 187 F.3d 1251 (11th Cir.1999). However, as discussed infra, Plaintiffs' reliance on these cases is largely misplaced because the aforementioned cases involve laws that specifically regulate protected speech or expression, whereas § 6-15 is a law of general application that regulates conduct, not speech or expression.

Even assuming that *Freedman, FW/PBS,* and *Boss Capital* are applicable to the instant action, Plaintiffs' argument concerning judicial review fails because the Eleventh Circuit has "never squarely held that an explicit judicial review provision is essential [for licensing ordinances]." *Lady J. Lingerie v. City of Jacksonville,* 176 F.3d 1358, 1363 (11th Cir.1999). Indeed, the Eleventh Circuit has stated that "[i]t may be enough that state law provides a general right to judicial review of administrative decisions, [such as licensing and zoning decisions]." *Id.* Furthermore, despite what Plaintiffs would have the court believe, the Eleventh Circuit's recent decision in *Boss Capital* does not require that a licensing ordinance explicitly provide for judicial review of licensing decisions. In fact, the *Boss Capital* court held that "[t]he need for a prompt judicial decision is [ ] less compelling for licensing ordinances than for censorship ordinances" and thus, "*access* to prompt judicial review is sufficient for licensing decisions." 187 F.3d at 1256 (emphasis added). In the instant action, it is undisputed that Plaintiffs' had access to judicial review of Defendants' revocation decision via the numerous common law remedial writs available and also through the various Alabama statutory provisions available that allow judicial review of adverse actions taken by a municipality. *See* Def.s' Br. at 12-13. Not to mention the judicial review that this court has provided. Therefore, based on the foregoing, the court is unpersuaded that § 6-15 is unconstitutional simply because it does not explicitly provide for access to judicial review.

Section 6-15, of the Daleville Code, runs afoul [of] the Eleventh Circuit Court of Appeals' opinion in *Boss Capital v. City of Casselberry,* 187 F.3d 1251 (11th Cir.1999). *Unlike* the City of Casselberry's *1329 ordinance, the Daleville

Revocation Ordinance on its face fails to provide for judicial review or access, and should be unconstitutional [sic] prior restraint [FN6] and as applied for the following reasons:

> FN6. Plaintiffs present this prior restraint argument separately from their general First Amendment challenge to § 6-15. Therefore, the court will address Plaintiffs' prior restraint argument separately herein.

a. It fails to maintain the status quo of protected speech;
b. Provides for restraint prior to judicial review or resolution;
c. Gives the City Council unbridled discretion to revoke licensees [sic];
d. Fails to provide judicial access as required.
(Pl.s' Br. at 6) (emphasis in original.) In short, Plaintiffs contend that § 6-15 impermissibly burdens their First Amendment protected [FN7] nude dancing activities. (*Id.*)

> FN7. "The First Amendment explicitly protects 'the freedom of speech [and] of the press'--oral and written speech--*not* 'expressive conduct.' " *Barnes,* 501 U.S. at 576, 111 S.Ct. 2456 (5-4 decision) (Scalia, J., concurring) (emphasis added.) However, the United States Supreme Court has held that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." *Id.* at 567, 111 S.Ct. 2456. In other words, the nude dancing that Plaintiffs seek to conduct at Fantasies is a form of expression that garners a limited amount of protection under the First Amendment. *See id.*

However, § 6-15 is undisputedly a law of general application that regulates unlawful conduct and is not specifically targeted at any form of protected speech or expression. Therefore, it is highly questionable whether § 6-15 implicates the First Amendment at all. *See Barnes,* 501 U.S. at 576, 111 S.Ct. 2456 (5-4 decision) (Scalia, J., concurring); *see also Arcara v. Cloud Books,* 478 U.S. 697, 707, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (holding that the First Amendment is not implicated when the challenged statute is "directed at unlawful conduct having nothing to do with ... expressive activity"). Indeed, every case relied upon by Plaintiffs in support of their attack on § 6-15 can be distinguished from the instant matter because these cases address laws that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

specifically regulate forms of protected speech or expression. *See Freedman v. State of Maryland,* 380 U.S. 51, 52, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (addressing a First Amendment challenge to Maryland's motion picture censorship statute); *FW/ PBS v. City of Dallas,* 493 U.S. 215, 220, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (addressing a First Amendment challenge to "a licensing scheme in a comprehensive city ordinance [specifically] regulating sexually oriented businesses"); *Boss Capital,* 187 F.3d at 1253-54 (addressing First Amendment challenges to a zoning ordinance that specifically regulates adult entertainment establishments and a licensing ordinance that specifically regulates adult entertainment establishments); *4805 Convoy v. City of San Diego,* 183 F.3d 1108, 1111 (9th Cir.1999) (addressing a First Amendment challenge to "the City of San Diego's nude dancing licensing ordinance"); *DLS v. City of Chattanooga,* 894 F.Supp. 1140, 1143 (E.D.Tenn.1995) (addressing a First Amendment challenge to "Chattanooga's adult-oriented establishment ordinance"). In other words, Plaintiffs have failed to make a "clear showing that [an] injunction ... is definitely demanded by the [First Amendment to the] Constitution." *Church,* 30 F.3d at 1342. Therefore, the court is hesitant to determine the outcome of Plaintiffs' ambiguous constitutional claims when such a determination may not be required. *See Boss Capital,* 187 F.3d at 1254 ("[I]t is our custom not to decide difficult constitutional questions unless we must.") (citing *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Accordingly, the court finds that Plaintiffs have failed to establish a substantial likelihood of success on the merits of their First Amendment challenge to § 6-15 and, thus, *1330 preliminary injunctive relief is not warranted.

Separate from their broad First Amendment challenge to § 6-15 discussed above, Plaintiffs also claim that Defendants' action, taken pursuant to § 6-15, "was an unconstitutional prior restraint of the Plaintiffs' First Amendment right to engage in non-obscene expression and on the Plaintiffs' freedom of expression." (Mot. For Inj. Relief at 2-3.) In support of this claim, Plaintiffs rely *solely* upon the case of *Cohen v. City of Daleville,* 695 F.Supp. 1168 (M.D.Ala.1988) (Thompson, J.). However, for the reasons set forth herein, the court concludes that the reasoning of *Cohen* does not govern the instant matter and, therefore, Plaintiffs fail to show a substantial likelihood of success on the merits of their prior restraint claim.

In *Cohen,* the plaintiff ("Mr.Cohen") was "a public purveyor of sexually explicit videotapes in Daleville, Alabama." *Id.* at 1169. Mr. Cohen experienced "trouble with the law" in the course of conducting his business, and in 1987 Mr. Cohen was arrested and pleaded guilty to violating an anti- obscenity law which prohibited the distribution of obscene videotapes. *See id.* at 1169-70. The charge was a misdemeanor and Cohen paid a $1,000 fine. *See id.* at 1170. Two months later, "the Daleville City Council notified Cohen that it was going to conduct a public hearing with respect to the issue of revoking his business license," pursuant to Daleville City Code § 6-15 ("§ 6-15"). *Id.*

At the public hearing, the Daleville City Council heard evidence regarding Mr. Cohen's distribution of obscene materials and "viewed selected samples from the sexually explicit videotapes the police [had] seized from Cohen's business." *Id.* Mr. Cohen's attorney did not offer any evidence, but merely stated that the proposed revocation would "constitute an impermissible prior restraint." *Id.* One week after the hearing, "the city council issued a statement finding that Cohen had conducted his business both immorally and illegally, and ordering that Cohen's business license be revoked for 90 days." *Id.* The specific grounds cited for the revocation were as follows:

> [T]hat Cohen had conducted his business in a manner 'detrimental to the public morals,' so as 'to constitute a nuisance' [and] ... that he had operated his business 'in an illegal manner as evidenced by [his] ... plea of guilt ... to criminal charges arising from [his] activities on Business premises.

*Id.* (quoting Daleville City Council's Revocation Order.) Thereafter, Mr. Cohen filed a lawsuit pursuant to 42 U.S.C. § 1983, "charging that the city's [ ] decision to revoke his business license, constitute[d] a 'prior restraint,' in violation of the [F]irst [A]mendment to the United States Constitution." *Id.* at 1169.

In response, the City of Daleville ("Daleville") argued that the revocation of Mr. Cohen's license did not constitute a prior restraint of speech because the revocation was meant to serve only as a punishment for Cohen's admitted violation of anti-obscenity laws, not as a "suppression of presumptively protected materials." *Id.* at 1171-72. In essence, Daleville's primary justification for its action was that Mr. Cohen

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

84 F.Supp.2d 1317
**(Cite as: 84 F.Supp.2d 1317, \*1330)**

Page 12

had undisputedly distributed obscene materials in the past and, therefore, deserved to be punished accordingly. *See id.* Thus, for reasons pertaining directly to the obscene materials that Mr. Cohen had distributed in the past, Daleville sought to rationalize the revocation of Cohen's license.

However, the *Cohen* court found no merit in Daleville's argument and concluded that the revocation of Cohen's business license was a prior restraint of speech. In reaching this conclusion, the court found that "Daleville revoked Cohen's license to prevent future sales of sexually explicit videotapes, and not for the purpose of punishing him for having committed an illegal or immoral act at his store." *Id.* at 1172. Therefore, because "Daleville primarily intended to restrain Cohen's exercise of [F]irst [A]mendment rights," the court found that Daleville's actions constituted \*1331 an impermissible prior restraint of presumptively protected speech. *Id.* at 1173. Accordingly, the court enjoined Daleville from "enforcing its order revoking Cohen's business license." *Id.*

[14] This court, however, finds that the reasoning in *Cohen* does not control the instant action primarily because the reasons for the revocation of the Fantasies' license are quite different than the reasons for the revocation of Cohen's license. [FN8] Here, Defendants offer the following justifications for the revocation: (1) Plaintiffs were operating Fantasies without a health permit, which is a violation of City Ordinance and State Law (Jt.Stip. of Facts ¶ 5; ¶ 12B; App. A at 30); [FN9] (2) Plaintiffs, in violation of State Law, obtained the Fantasies license under false pretenses (Jt.Stip. of Facts ¶ 5; ¶ 12A; ¶ 12D); [FN10] (3) Plaintiffs, in violation of City Ordinance, under-reported their gross receipts and consequently, underpaid their taxes for the month of July, 1999 [FN11] (*Id.* at ¶ 9; ¶ 12D; \*1332 App. A at 32-33; 55-56; Def.s' Br. at 7); (4) Plaintiffs were operating their business in violation of Daleville Code Sections 3-27 through 3-30, which prohibit sexual conduct and nudity in establishments dealing in alcoholic beverages [FN12]

> FN8. Further, the rationale in *Cohen* does not control the instant case because the form of speech involved in *Cohen* differs from the form of expression involved in the instant action. *Cohen* dealt with the distribution of video tapes, which is a "presumptively protected" form of speech. 695 F.Supp. at 1171. In contrast, the instant action involves nude dancing, which is a form of

expression that garners only a limited amount of protection under the First Amendment. *See supra* note 7.

> FN9. Plaintiffs admit that they were operating Fantasies without a health permit, which is a violation of City Ordinance and State Law. (App. A at 30.) Plaintiffs, however, deny responsibility for this violation and claim that Defendants "erred in issuing a restaurant license to Fantasies when [Plaintiffs had] asked for a 'Coffee Shop' license." (Pl.s' Br. at 3.) Apparently, Plaintiffs contend that the issuance of a "Coffee Shop" license would have excused them from obtaining a health permit. (*Id.*) (citing Chapter 420-3-22.36 of the Rules of State Board of Health, which states that "[e]stablishments serving *only coffee* in single-service cups and utilizing single-service stirrers and non-potentially hazardous coffee condiments do not require a permit or inspections") (emphasis added.) The court notes, however, that Plaintiffs admittedly served more than just coffee in Fantasies. (Jt.Stip. of Facts ¶ 6) ("Non-alcoholic drinks were mixed, blended, and dispensed in Fantasies along with ice which was scooped from an ice chest."). Therefore, Plaintiffs did not qualify for the "Coffee Shop" license cited in their Brief. (Pl.s' Br. at 3.) Further, the Department of Health Official who inspected Plaintiffs' premises "testified that any place that dispenses, mixes or blends drinks, or dispenses ice with a scoop, must have a health permit. Therefore, Fantasies should have had a 'limited restaurant' health permit and in operating without such a permit, was in violation of State Law." (Jt.Stip. of Facts ¶ 12B.) Based on the foregoing, the court finds no merit in Plaintiffs' unsupported argument that they should not be held responsible for failing to obtain a health permit required by law.

> FN10. Alabama Code Section 40-12-8 provides that:
> Any person who shall knowingly make any false affidavit or certificate in connection with the ordering or procuring of a license to carry on any business or do anything in this state for which a license is required shall be guilty of a misdemeanor....
> ALACODE § 40-12-8 (1998 Supp.). The Daleville Police Chief testified that Plaintiffs violated this statute by making certain factual misrepresentations to the Administrative Clerk who issued the Fantasies license. (Jt.Stip. of Facts ¶ 12D.)

For instance, Plaintiffs said they wanted a "Coffee Shop" license for Fantasies. (Pl.s' Br. at 3.) However, Fantasies was never used as a "Coffee Shop," but rather it was used strictly as an erotic dancing club. Further, Plaintiffs stated that they would only serve "pre-packaged food" in Fantasies. (Jt.Stip. of Facts ¶ 5.) However, Daleville's Police Chief testified "that no pre-packaged food was found on the Fantasies premises upon several inspections by City and State Investigators." (*Id.* ¶ 12D.)

In response, Plaintiffs argue that "[t]here is no provision of the Daleville Code [ ] that requires the applicant to note the type of entertainment to be provided on the application for a license." (Pl.s' Br. at 3.) Yet Plaintiffs do not deny that they completely misrepresented the nature of their business to the clerk who issued the Fantasies license. Therefore, the court finds Plaintiffs' argument unpersuasive.

FN11. Section 6-9 of the Daleville City Code provides that:
It shall be unlawful for any person to knowingly or willingly make a false written affidavit as to the amount of stock on hand or volume of gross receipts, revenue or business.... DALEVILLE, ALA., CODE § 6-9 (1977). The Daleville Chief of Police testified that Plaintiffs violated this statute by under-reporting their gross receipts for the month of July 1999. (Jt.Stip. of Facts ¶ 12D.) In support of this testimony, Defendants submitted evidence showing that Plaintiffs reported $3,363 of total revenue for T-Backs and Fantasies in the month of July, 1999. (Def.s' Ex. 7 at 6; App. A at 32; Jt.Stip. of Facts ¶ 12D.) Yet, in an affidavit submitted to this court on September 24, 1999, Plaintiff Connolly states that "for the month of July 1999, door revenues were $4,035" from Fantasies alone. (Def.s' Ex. 8.)

Plaintiffs acknowledge this discrepancy, but claim that "if it's an under- payment, it's an honest under-payment." (App. A at 33; Pl.s' Br. at 4.) Further, Plaintiffs set forth several vague arguments as to why they should not be held responsible for their mistake. (Pl.s' Br. at 3-4; App. A at 33, 56-58.) However, these arguments are cursory, conclusory, and do not explain why Plaintiffs failed to report their entire gross income for the month of July, 1999. Therefore, the court finds Plaintiffs' arguments to be unpersuasive and, thus, will forego any further discussion thereof.

FN12. Section 3-27 of the Daleville City Code City states that:
The purpose of sections 3-27 through 3-30 is to prohibit sexual conduct and nudity in establishments dealing in alcoholic beverages and prohibit persons owning, maintaining or operating such establishments from permitting any such prohibited activity.
DALEVILLE, ALA., CODE § 3-27 (1987). Section 3-28 of the Daleville City Code defines establishments dealing in alcoholic beverages as follows:
[A]ny business establishment operating within the corporate limits of the city which sells, dispenses or allows the consumption of alcoholic beverages on the premises.
DALEVILLE, ALA., CODE § 3-28 (1987). Ordinances, such as Daleville's, that prohibit nude dancing in establishments where alcoholic beverages are sold have long been upheld by the United States Supreme Court and by the Eleventh Circuit. *See Sammy's of Mobile v. City of Mobile,* 140 F.3d 993, 995-996 (11th Cir.1998). However, Plaintiffs assert that these ordinances do not apply to them because of a common wall that separates T- Backs (the nightclub where alcohol is sold) from Fantasies (the nude dancing club where alcohol is not sold). (App. A at 38; Pl.s' Br. at 3- 4.) In essence, Plaintiffs contend that T-Backs and Fantasies are two separate establishments and, because Fantasies does not serve alcohol, nude dancing can legally be performed there.

On the other hand, Defendants aver that Plaintiffs' attempt to characterize T-Backs and Fantasies as two separate establishments is merely a "sham" to get around the City Ordinances which prohibit nude dancing and alcohol on the same premises. (Def.s' Br. at 10; App. A at 38.) Defendants argue that "[t]he activities of [Plaintiffs] are conducted in the same structure, under the same roof, with only a nominal division of the room by a partition, where patrons are channeled through the nightclub for alcohol consumption, then allowed to step through a doorway in the partition to view nude dancers and have private nude lap dances, then step back into the nightclub for further alcohol consumption." (Def.s' Br. at 10; App. A at 34.) In short, Defendants claim that Plaintiffs have violated City Ordinances by operating a nude dancing club and a nightclub in the same building, despite the fact that the two clubs are separated by a partition.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Although the Parties have cited no authority regarding this issue, common sense indicates that a slight separation between facilities where alcohol is sold and facilities where nude dancing is conducted is not sufficient to overcome valid ordinances that prohibit the combination of nude dancing and alcohol on the same premises. *See generally Ranch House,* 22 F.Supp.2d at 1306, n. 7. Indeed, the Alabama Supreme Court recently held that "the City of Anniston has the authority to forbid a business from permitting the drinking of alcoholic beverages and nude dancing at the same time," despite the fact that the business separates the area where alcohol is sold from the area where nude dancing is conducted. *Ranch House v. City of Anniston,* 678 So.2d 745, 746 (Ala.1996). Therefore, based on the foregoing, the court is unpersuaded by Plaintiffs' argument concerning the separation between T-Backs and Fantasies.

(Jt.Stip. of Facts ¶ 12D; Def.s' Prelim.Br. at 5-6; Def.s' Br. at 9-10); and (5) Plaintiffs were allowing intimate physical contact to occur between nude dancers and customers, which constitutes a nuisance and is against public health and morals. [FN13] *1333 (Jt.Stip. of Facts ¶ 12D; App. A at 47- 49; 52-54.) Although Plaintiffs were given notice of these alleged infractions before the October 14, 1999 due process hearing, (Def.s' Ex. 11 at 2; App. A at 57-58), they presented little if any defense to these charges before the City Council. (Jt.Stip. of Facts ¶ 12; App. A. at 29-30; Def.s' Br. at 14.) However, Plaintiffs now attempt to raise various defenses for the first time which the court finds unpersuasive. *See supra* notes 9-13.

FN13. Plaintiffs concede that intimate contact does sometimes occur between nude dancers and customers, but Plaintiffs attempt to control such conduct by closely monitoring each dance and by taking remedial action whenever improper contact occurs. (App. A at 35-37.)

In contrast, Defendants presented substantial evidence in support of revocation, (Joint Stip. of Facts ¶ 12), such that "the Council and Mayor [FN14] voted unanimously to revoke Fantasies Business License No. 19990561 pursuant to Daleville Code Sec[tions] 6-14 and 6-15." (*Id.* ¶ 13.) Therefore, based on the evidence before the court, it appears that Defendants were well-justified in revoking the Fantasies' license and, unlike the

Defendants in *Cohen,* their justifications had nothing to do with the suppression of protected speech. Consequently, unlike the *Cohen* court, this court cannot find that Defendants' primary intention was to restrain Plaintiffs from exercising their First Amendment rights. [FN15] Thus, the court finds that Plaintiffs have failed to establish a substantial likelihood of success on the merits of their prior restraint claim and preliminary injunctive relief is therefore unwarranted. [FN16]

FN14. Plaintiffs argue that "[t]he fact that the Mayor voted, ... *might* be in violation of the law that governs the Mayor-Council form of government and should nullify the Revocation Order[.]" (Pl.s' Br. at 5) (citing ALACODE § 11-43C-2 (1989 Supp.)) (emphasis added.) However, as Defendants correctly assert, § 11-43C-2 only applies to "Class 5 municipalit[ies] in the state of Alabama." ALACODE § 11-43C-1 (1989 Supp.). Class 5 municipalities are defined as "[a]ll cities with a population of not less than 25,000 and not more than 49,999 inhabitants." ALACODE § 11-40-12(a) (1989 Supp.). Because the City of Daleville has less than 5,999 inhabitants, (Def.s' Br. at 10; 1990 Federal Decennial Census), § 11-43C-2 does not apply. Rather, § 11-43-2 of the Alabama Code applies in this instance and allows a mayor to vote as follows: "At his discretion he [or she] may vote as a member of the Council on any question coming to a vote." ALACODE § 11-43-2 (1989 Supp.). Therefore, based on the foregoing, the court finds no merit in Plaintiffs' argument concerning the mayor's vote.

FN15. Plaintiffs insinuate that the revocation of the Fantasies license was a pretext for suppression of First Amendment protected expression. (Pl.s' Br. at 8.) However, Plaintiffs do not expound upon this allegation and the court is extremely hesitant to strike down "otherwise constitutional legislation on the basis of a speculated illicit legislative motive." *International Food & Beverage Systems v. City of Fort Lauderdale,* 794 F.2d 1520, 1525 (11th Cir.1986). Therefore, Plaintiffs' mere insinuation of pretext does not alter the court's findings.

FN16. The court notes that the instant action is much more closely akin to the case of *Arcara v. Cloud Books,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), than it is to *Cohen.* In *Arcara,* the United States

Supreme Court upheld the revocation of an adult bookstore owner's business license because the store had become a scene for prostitution and other public sex acts which were prohibited by a nuisance provision of New York's public health code. *Id.* at 699, 106 S.Ct. 3172. The Court held that "[b]ookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.* at 707, 106 S.Ct. 3172. The Court also held that the revocation did not constitute a prior restraint of protected speech for two reasons. First, because "respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find." *Id.* at 706, n. 2, 106 S.Ct. 3172. And second because "the closure order has nothing to do with any expressive conduct at all." *Id.* at 706, n. 2, 106 S.Ct. 3172.

Although Defendants do not cite *Arcara* in their Brief, the court notes that *Arcara* seemingly controls the instant action and defeats Plaintiffs' prior restraint claim. As in *Arcara*, Plaintiffs here are apparently free to conduct their exotic dancing operation at another location in Daleville, so long as they do so legally. Also, like *Arcara*, the revocation order in the instant case was based upon valid justifications that had nothing to do with expressive conduct. *See supra* notes 9-13 and accompanying text. Finally, the New York nuisance provision examined in *Arcara* is analogous to § 6-15 of the Daleville City Code in that both laws focus not on the suppression of protected speech, but rather on the termination of illegal conduct.

Therefore, it appears that in light of *Arcara,* Plaintiffs are unable to show a substantial likelihood of success on the merits of the prior restraint claim. However, because this case is at the preliminary injunction stage, the court makes no determination on the merits of the prior restraint claim and will forego any further discussion thereof. In the event that this case proceeds to the merits, the court will expect the Parties to fully brief *Arcara* and discuss its relevance to the instant action.

*1334 Finally, Plaintiffs contend that the revocation of the Fantasies license constitutes a violation of their due process rights afforded by the Fourteenth Amendment. (Mot. For Inj. Relief at 3.) However, Plaintiffs fail to elaborate on this contention and do not even mention it in their Brief. Therefore, the court finds that Plaintiffs have failed to carry their burden of persuasion as to this claim and, thus, preliminary injunctive relief is not appropriate. [FN17]

> FN17. In the alternative, the court notes that because Plaintiffs concede that they were afforded a full due process hearing before the revocation occurred, (Jt.Stip. of Facts ¶ 12), the likelihood of success on the merits of their due process claim is greatly diminished. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that due process is satisfied if "some form of hearing is required before an individual is finally deprived of a property interest"). Therefore, even if Plaintiffs had adequately addressed this claim, it is doubtful that they could have established a substantial likelihood of success on the merits.

## ORDER

Based on the foregoing, its is CONSIDERED and ORDERED that Plaintiffs' Motion To Reconsider Denial Of Preliminary Injunction be and the same is hereby DENIED.

Because the Parties have stipulated that all evidence is presently before the court and that the Parties wish to proceed on the merits of this case, the court hereby DIRECTS Plaintiffs and/or Defendants to file a Motion For Summary Judgment along with a detailed brief in support of Summary Judgment on or before February 1, 2000.

84 F.Supp.2d 1317

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

300 F.Supp. 163
**(Cite as: 300 F.Supp. 163)**

United States District Court, M.D. Alabama,
Northern Division.

**Sylvester SCOTT, Ernestine Wilson, Leroy W.
Dunbar, Helen Brown, Timothy Mays,
Wheeler M. Washington, Alexander S. Anderson,
Individually and on behalf of all
others similarly situated, Plaintiffs,
v.
ALABAMA STATE BOARD OF EDUCATION,
Governor Albert P. Brewer, Ex Officio
Chairman of Alabama State Board of Education,
Montgomery, Alabama; Levi
Watkins, Individually and as President of
Alabama State College, Montgomery,
Alabama; Rose H. Robinson, Individually and as
Acting Director of Student
Affairs, Alabama State College, Montgomery,
Alabama; Simon W. Walker,
Individually and as Coordirector of Student
Teaching; John B. College,
Montgomery, Alabama; Savage J. Whisenhunt,
Individually and as Director of
Student Teaching, John B. Hall, Individually and
as Chairman of the Faculty
Discipline Committee; Zelia S. Evans, Individually
and as a member of the Ad
Hoc Faculty-Student Committee; and B. J. Simms,
Individually and as a member of
the Ad Hoc Faculty-Student Committee,
Defendants.**

**Civ. A. No. 2865-N.**

May 14, 1969.

Certain students at college, who had been suspended
or dismissed from college because of participation in
demonstration, brought suit for injunction against
Alabama State Board of Education and others. The
District Court, Johnson, Chief Judge, held that
students who were indefinitely suspended or
dismissed from college on specific charge that they
threatened or pushed state official, or who were found
guilty of misappropriating state equipment, or who
blocked entrances of college dining hall, were not
denied due process on ground of vagueness of
charges.

Judgment adverse to certain students and in favor of
other students.

West Headnotes

**[1] Constitutional Law ⊕278.5(7)**
92k278.5(7)

(Formerly 92k318(2), 92k318)

Where college students, who had been indefinitely
suspended or dismissed from college because of
participation in demonstration, brought suit for
injunction against Alabama State Board of Education
and others, contending that students were deprived of
education without due process of law, question was
whether rudimentary elements of fair play had been
observed in faculty-student committee hearing.

**[2] Constitutional Law ⊕278.5(7)**
92k278.5(7)

(Formerly 92k318(2), 92k318)

If student, who engaged in demonstration at college,
and who was indefinitely suspended or dismissed
from college after hearing before faculty-student
committee, was notified and found guilty of one
satisfactory specific charge, he was not denied due
process on ground of vagueness, even though he was
also charged with unduly vague charges.

**[3] Constitutional Law ⊕278.5(7)**
92k278.5(7)

(Formerly 92k318(2))

College students who were indefinitely suspended or
dismissed from college on specific charge that they
threatened or pushed state official, or who were found
guilty of misappropriating state equipment, or who
blocked entrances of college dining hall, were not
denied due process on ground of vagueness of
charges.

**[4] Constitutional Law ⊕278.5(7)**
92k278.5(7)

(Formerly 92k318(2), 92k319)

College students, who were indefinitely suspended or
dismissed from college because of participation in
demonstration, were denied due process, where they
were charged with refusal to obey regulation or order
of college or with discouraging other college students
from attending classes, because charges were
ambiguous and vague.

**[5] Colleges and Universities ⊕9.30(7)**
81k9.30(7)

(Formerly 81k9)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

300 F.Supp. 163
(Cite as: 300 F.Supp. 163)

College students, who were afforded opportunity to be heard, to present evidence, and to be represented by counsel at hearings before faculty-student committee before they were indefinitely suspended or dismissed from college for participating in demonstration, but who, on advice of counsel, did not take advantage of those opportunities, waived whatever rights they may have had to use them.

**[6] Colleges and Universities ⨀➔9.30(6)**
81k9.30(6)

(Formerly 81k9)

If student was found guilty of specific charge of conduct not protected by free speech guaranteed by First Amendment and was suspended or dismissed from college, then his suspension or dismissal could stand, though he was also charged with activities which might be protected by First Amendment. U.S.C.A.Const. Amend. 1.

**[7] Constitutional Law ⨀➔90.1(2)**
92k90.1(2)

Conduct of students, who were suspended or dismissed from college because of participation in demonstration, was not protected by free speech provision of First Amendment of Federal Constitution because their conduct was largely peaceful and nonviolent and involved little if any destruction of college property. U.S.C.A.Const. Amend. 1.

**[8] Colleges and Universities ⨀➔9.30(1)**
81k9.30(1)

(Formerly 81k9)

Fact that college students believe strongly that their cause is right does not entitle them to use, in advancing their cause, any means that may seem effective at the moment, whether they are lawful or unlawful and whether or not they are consistent with the interests of others.

**[9] Injunction ⨀➔150**
212k150

When a party brings a dispute with another party into court for judicial resolution in suit for injunction, both parties are under obligation not to resort to other means, including those which in other circumstances would be constitutionally protected, of forcing a settlement of dispute in their favor, and temporary restraining order will issue to maintain status quo.

**[10] Injunction ⨀➔190**
212k190

College students, whose dismissals and suspensions by college had been upheld by federal district court in suit for injunction, could not resort to direct action on campus of college to exert pressure on defendant officials to change their decision concerning the dismissals and suspensions.

**[11] Injunction ⨀➔190**
212k190

College students, who had been suspended or dismissed from college because of participating in demonstration, would be enjoined from refusing to leave campus, from threatening any faculty member or student, from preventing attendance in classes of students and of faculty members, from destroying property, and from disrupting orderly operations of college.
*164 Charles S. Conley and William H. Thomas, Montgomery, Ala., for plaintiffs.

Gray, Seay & Langford, Montgomery, Ala., for defendant college officials.

Goodwyn, Smith & Bowman, Montgomery, Ala., for defendant state officials.

ORDER

JOHNSON, Chief Judge.

Plaintiffs are approximately 50 students at Alabama State College who were indefinitely suspended or dismissed from college because of their participation, along with a number of nonstudents, in events related to or growing out of 'demonstrations' in and around the college dining hall from March 29, 1969, to April 8, 1969. As a result of this activity the college was closed for a period from April 7 to April 21, 1969. Plaintiffs allege that the activities for which they were suspended or dismissed from school are protected by the First Amendment to the Constitution of the United States and that, in any event, the procedures adopted by the college did not satisfy the requirements of the due process clause of the Fourteenth Amendment. Their complaint seeks injunctive relief in the form of an order of reinstatement, and damages. The jurisdiction of this Court is invoked pursuant to the provisions of 28 U.S.C. 1331(a) and 1343(3) and (4).

President Levi Watkins and other officials of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

300 F.Supp. 163
(Cite as: 300 F.Supp. 163, *164)

Alabama State College filed an answer and a counterclaim in which they *165 sought injunctive relief against continuing actions of the plaintiffs alleged to be interfering with the orderly operation of Alabama State College as an educational institution. A motion for temporary restraining order was filed simultaneously and was granted May 5, 1969, on the basis of numerous affidavits reflecting that subsequent to filing this lawsuit plaintiffs, in an attempt to promote their cause by extra- judicial means, had:

(1) Refused to quit the campus after being dismissed or suspended as students; (2) Intimidated students desiring to attend classes and prevented their attendance at classes; (3) Intimidated faculty members desiring to conduct classes; (4) Damaged college property; and (5) Otherwise disrupted the orderly operation of Alabama State College as an educational institution.

The defendants Alabama State Board of Education and Governor Albert P. Brewer as ex officio Chairman thereof have moved to dismiss the complaint as it relates to them on the basis that primary responsibility for maintenance of order at the college rests with the college administration and that they have exercised no authority relative to the actions from which the complaint arises. This motion is due to be granted.

I

PROCEDURAL DUE PROCESS

In the landmark case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), a case also involving Alabama State College students, it was settled that due process requires notice and some opportunity for a hearing before students at a tax-supported college may be expelled for misconduct. Here, notice was given and hearings were held; the issue is whether the procedure provided satisfied constitutional requirements.

The evidence reflects that approximately 80 students were served with formal statements of charges. Each of these statements was on a form letter listing 11 charges growing out of the 'demonstration.'[FN1] Those charges which were deemed applicable to the addressee were marked with a prominent 'X.' The letter advised the students that hearings would be held on April 17, 1969, at which time they would be afforded an opportunity to be heard and to present

witnesses in their defense.

The hearings were later rescheduled for April 23, 1969. At that time, counsel for plaintiffs, representing some 50 of the students charged, objected to the statement of charges on the ground that the charges were unduly vague and did not advise students specifically of the acts they were alleged to have committed. When counsel's request that the charges be made more definite was denied, he and plaintiffs, on his advice, dramatically refused to participate in the hearings.

The hearings were held as scheduled before an Ad Hoc Faculty-Student Committee. This Committee heard the evidence against each student charged, made specific findings with respect to each charge, and made recommendations to President Watkins of an appropriate disposition of each case. As a result, it appears that 7 students were dismissed from the college 43 were indefinitely suspended, 21 were found not guilty, and 3 cases were disposed of otherwise. Those who were dismissed or suspended were offered an opportunity to have their cases reviewed by President Watkins. Of those who exercised that opportunity, at least eight had their indefinite suspensions reduced to special probation.

Plaintiffs' attack in this Court on their dismissals and suspensions continues to center on the alleged vagueness of the charges. Dixon, supra at 158, advises that:

'The notice should contain a statement of the specific charges and grounds which, if proven, would justify *166 expulsion under the regulations of the Board of Education.'

An examination of the statement of charges reveals that some of the charges do indeed lack the specificity required to enable a student adequately to prepare defenses against them. For example, the first charge provides:

'Willful refusal to obey a regulation or order of Alabama State, such refusal being of a serious nature and contributed to a substantial disruption of the administration and operation of the College, March 29-April 8, 1969.'

That charge is rendered completely open ended by the failure to specify which regulation or order was involved.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

On the other hand, certain of the other charges, when viewed in the circumstances of the case, make quite clear the basis upon which the college proposes to take disciplinary action. For example, the second charge provides:

'Principals in the seizure, occupation, and unauthorized use of the Alabama State Dining Hall and Union building, March 29-April 8, 1969.'

[1][2] Plaintiffs contend that one bad apple spoils the entire bushel, i.e., that if any of the charges against a student was unconstitutionally vague then he was deprived of an education without due process of law. This Court, however, cannot adopt such a rigid and formalistic approach. Dixon makes clear that the question in each case is whether the rudimentary elements of fair play have been observed. Thus, this Court concludes that if a student was notified and found guilty of one satisfactorily specific charge, then his dismissal or suspension will not be held to be procedurally inadequate on the ground of vagueness, whether or not he was also charged with unduly vague charges. By way of analogy, it may be observed that in the criminal law, where more rigorous procedures are required, an appellate court will not examine alleged errors with respect to one count of an indictment when the appellant was also convicted and sentenced concurrently on another count found to be or conceded to be vaild. Benefield v. United States, 370 F.2d 912 (5th Cir. 1966); Mishan v. United States, 345 F.2d 791 (5th Cir. 1965).

[3] An examination of the exhibits reveals that all but eight of the dismissed or suspended students were charged with and convicted of inter alia, being principals in the seizure, occupation, and unauthorized use of the dining hall. Of those eight remaining, Timothy Mays was found guilty of the specific charge that he 'threatened and/or pushed an Alabama State Official who was carrying out his appropriate functions at the College Dining Hall and Union building, March 29-April 8, 1969'; Jonny F. Hall was found guilty of the specific charge that he 'misappropriated and/or removed without authority Alabama State equipment and supplies, March 29-April 8, 1969'; and Marvin E. Wilson, Sandrew Marshall, and Bobby L. Cobb were found guilty of the specific charge that they 'blocked entrances and/or held doors so as to deny rightful persons normal entrance and exit to the Alabama State Dining Hall March 29- April 8, 1969.'

[4] Murry A. Hardy and Joshua Booker were charged only with the willful refusal to obey a regulation or order of Alabama State College-- the charge which was indicated above to be unduly vague. Leroy Dunbar was charged with the above vague charge and, in addition, with the charge that he 'through verbal exhortations and/or threats and/or intimidation prevented or discouraged other Alabama State students from attending classes, March 31-April 7, 1969.' That charge is also ambiguous and vague. 'Exhortation' in normal usage would be used to describe speech that might well be constitutionally protected. These three students will be ordered reinstated, pending, if the college desires, a further specification of the charges and another hearing.

Plaintiffs have not directly challenged the adequacy of the hearings themselves. *167 In the course of the hearing in this Court, however, they did raise some question about the impartiality of the Committee which heard the evidence. The evidence reflects that this Committee was selected in a reasonable fashion considering the emotional circumstances which tended to render nearly everyone at the college at least mildly partisan. Moreover, this Court, with the advantage of hindsight, finds that, viewed in the large, the Committee appears to have dealt fairly with the students involved.

[5] It is also appropriate to note that plaintiffs were afforded an opportunity to be heard, to present evidence, and to be represented by counsel at the hearings. Those who on advice of counsel did not take advantage of these opportunities have waived whatever rights they may have had to them. This Court will express no opinion on whether or not that advice reflected good political judgment; it will be observed that, although plaintiffs' counsel is an able and experienced attorney, it may have been unwise legal advice. As plaintiffs' counsel knows, or should know, when one makes an objection--whether meritorious or not-- in a judicial proceeding, and the objection is overruled, the only orderly and efficient procedure is to have the objection noted and to appeal to higher authority if one does not prevail. Any other procedure would afford endless opportunities for delay in unmeritorious cases by the simple tactic of making an objection and walking out if the objection is overruled. Here, the Committee was duly and legally constituted, jurisdiction had vested, and due notice of the hearing had been given.

II

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## FIRST AMENDMENT

[6] Having determined that the substantial majority of the dismissed and suspended students were not denied procedural due process, this Court now finds it necessary to reach the issue of whether their dismissals and suspensions violated substantive rights protected by the First Amendment. This Court again takes the view that if a student was found guilty of a specific charge of conduct not protected by the First Amendment, whether or not he is also charged with activities which might be protected, then his suspension or dismissal may stand. The issue then becomes whether the activities described by the college as 'the seizure, occupation, and unauthorized use of the dining hall' and described by the students as 'a demonstration' are protected by the First Amendment.

The evidence reflects, however one describes it, that these plaintiffs and other students and nonstudents, rather than the duly constituted authorities of the college, were in control of the dining hall for a period of ten days. Although the operations of the dining hall were not altogether halted, it is clear that the normal and orderly operation of the dining hall was considerably altered. Whether intended or not, one clear result of these students' actions was to deprive numerous other people, including students with contractual rights in the form of meal tickets, of the opportunity to use the dining hall. The college clearly has a right to enforce regulations which tend to prevent conduct having this effect.

The plaintiffs seem to be arguing that irrespective of the college's interest in the orderly operation of the dining hall, their conduct was protected symbolic speech because they intended by their conduct to communicate their dissatisfaction with certain conditions at the college. The Supreme Court rejected that theory in United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968):

'We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'

[7] Plaintiffs also seem to advance the view that their conduct was protected because it was largely peaceful and nonviolent and involved little if any destruction of college property. But that characteristic *168 alone does not make the conduct protected speech.

[8] There seems to be a tendency in this country-- and it is especially prevalent among students-- toward the view that if one only believes strongly enough that his cause is right, then one may use in advancing that cause any means that seem effective at the moment, whether they are lawful or unlawful and whether or not they are consistent with the interests of others. The law, of course, cannot and does not take that position, and those who do must not expect to receive substantive protection from the law; to the contrary, they must expect to be punished when they violate laws and college regulations which are part of a system designed to protect the rights and interests of all.

III

## WORK   AND   PRACTICE   TEACHING PROGRAMS

Plaintiffs also complain that certain of their campus jobs were terminated and that certain of them were not permitted to begin or to resume their participation in the practice teaching program after the college was reopened because of their participation in the 'demonstrations.' Plaintiffs contend that this was summary punishment without a hearing that violated their procedural rights and that it was punishment for engaging in constitutionally protected activity in violation of their rights under the First Amendment.

The First Amendment issue has already been decided above adversely to the plaintiffs. The issue of whether due process requires a hearing before participation in work and practice teaching programs may be terminated-- a question of first impression-- is now moot with respect to those students whose dismissals and suspensions have been upheld and is premature with respect to those students who have been reinstated.

IV

## DEFENDANTS' COUNTERCLAIM

[9] Defendants have taken the position in this case that the activities for which most of the students were suspended or dismissed were not constitutionally protected and that the plaintiffs were afforded procedural due process. They further allege that although plaintiffs have been dismissed or suspended, many of them have remained on campus and have engaged in activities designed to reverse the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

administration's decision; that such activities have interfered with the rights of other students and otherwise disrupted the orderly operation of the college as an educational institution. As indicated above, when these allegations were substantiated by affidavits, the Court issued a temporary restraining order against the plaintiffs. That order was based on this Court's consistently held position that when a party brings a dispute with another party into court for a judicial resolution both parties are under an obligation not to resort to other means, including those which in other circumstances would be constitutionally protected, of forcing a settlement of the dispute in their favor. This requirement is grounded in the nature of the judicial process. That process nearly always requires a certain period of time prior to a hearing and to a decision, although in this case and similar cases it may be only a few days. During that time, in order for the court to retain complete jurisdiction over the subject matter, the status quo as of the time of the filing of the suit must be maintained. Moreover, it is imperative that the integrity of an independent judiciary that the court be free from pressures, direct or indirect, tending to preclude thoughtful, deliberate and unemotional consideration of the legal issues.

[10] It is also imperative that those who invoke the judicial process recognize the finality of a judicial resolution of the controversy. A decision of this Court, of course, may be appealed to higher courts; the Alabama Legislature may *169 be prevailed upon to change the rules with respect to student conduct. But those students whose dismissals and suspensions by Alabama State College have been upheld by this Court may not resort to direct action on the campus of Alabama State College for the purpose of exerting pressure on the officials, i.e., the defendants in this suit, to change their decision concerning the dismissals and suspensions. The temporary restraining order will be enlarged into a preliminary injunction.

In accordance with the foregoing, it is the order, judgment and decree of this Court that the plaintiffs' motion for a preliminary injunction, except insofar as that motion relates to plaintiffs Joshua Booker, Murry A. Hardy, and Leroy W. Dunbar, be and the same is hereby denied.

It is further ordered that plaintiffs Joshua Booker, Murry A. Hardy, and Leroy W. Dunbar be reinstated as students at Alabama State College with the same rights which attached to their status as students prior

to their suspension, pending, if defendant officials wish to proceed further against these plaintiffs, a more detailed specification of charges and an additional hearing.

It is further ordered that the motion of defendants Alabama State Board of Education and Governor Albert P. Brewer, as ex officio Chairman thereof, to dismiss this action against them as parties defendant, be and the same is hereby granted.

[11] It is further ordered that the named plaintiffs Sylvester Scott, Ernestine Wilson, Helen Brown, Timothy Mays, Wheeler M. Washington, and Alexander S. Anderson; all other plaintiffs whose dismissals or suspensions by Alabama State College have been upheld by this Court; and those students or nonstudents acting in concert with them and having actual notice of this order, be and each is hereby enjoined and restrained from:

(1) Failing and refusing to leave the campus of Alabama State College after having been dismissed or indefinitely suspended as a student; (2) Failing to leave the grounds or any building located on the campus of Alabama State College when requested to do so by officials of said college; (3) Taking possession or failing or refusing to surrender possession of any of the buildings located on the grounds of Alabama State College; (4) Harassing, threatening or intimidating any faculty or staff member, employee, student or official of Alabama State College, or any of its several colleges and departments; (5) Obstructing or preventing the attendance in classes of students and faculty members; (6) Destroying or attempting to destroy, defacing or attempting to deface any structures, buildings, materials or equipment used, held for use, maintained, operated or controlled by Alabama State College; and (7) Committing any other act or acts disrupting the orderly processes or operations of Alabama State College, or any of its several colleges and departments.

It is further ordered that the court costs incurred in this cause be and they are hereby taxed two-thirds against the plaintiffs and one-third against the defendant officials of Alabama State College, for which execution may issue.

(APPENDIX OMITTED)

FN1. A copy of this letter is attached to this order as Appendix A.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

300 F.Supp. 163
**(Cite as: 300 F.Supp. 163, \*169)**

300 F.Supp. 163

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works